**TRANSOHIO SAVINGS BANK,**
**et al., Appellants,**

**v.**

**DIRECTOR, OFFICE OF THRIFT**
**SUPERVISION, et al.,**
**Appellees.**

No. 91–5246.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 22, 1991.

Reargued Jan. 6, 1992.

Decided June 12, 1992.

Charles J. Cooper, with whom Michael A. Carvin and Robert J. Cynkar were on the brief, for appellants. Michael W. Kirk also entered an appearance for appellants.

Douglas Letter, Attorney, U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Dorothy L. Nichols, Associate General Counsel, Federal Deposit Ins. Corp., and Jeanette E. Roach, Counsel, Federal Deposit Ins. Corp., were on the brief, for appellee, F.D.I.C.

Aaron B. Kahn, Asst. Chief Counsel, Office of Thrift Supervision, with whom Harris Weinstein, Chief Counsel, Thomas J. Segal, Deputy Chief Counsel, and Robert J. Lesnick, Sr. Trial Atty., were on the brief, for appellee, Director, Office of Thrift Supervision. Harvey A. Levin, Attorney, Office of Thrift Supervision, also entered an appearance for appellees.

Before MIKVA, Chief Judge, WALD and BUCKLEY, Circuit Judges.

Opinion for the court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

In the mid–1980s, as the savings and loan industry deteriorated, the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Home Loan Bank Board encouraged a number of healthy thrifts to acquire failing ones. The government agencies provided financial assistance to the acquiring thrifts, and they promised favorable accounting treatment. Granting capital or accounting forbearances, the banking regulators allowed the thrifts to count toward their minimum capital requirements "supervisory goodwill," intangible assets created by the acquisitions. Appellants, Transohio Savings Bank and its holding companies (collectively referred to as "Transohio"), acquired two insolvent thrifts as part of such a "supervisory merger" in 1986.

In 1989, in major legislation addressing what had become known as the S & L Crisis, Congress forbade thrifts from counting supervisory goodwill toward minimum capital requirements, finding that stricter capital standards were essential to ensure the safety and soundness of the savings and loan industry. See Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). Soon after, the Office of Thrift Supervision (OTS), which had taken over the duties of FSLIC and the Bank Board, announced it would apply the new rules to all thrifts, including those that had received capital or accounting forbearances from the OTS' predecessors.

As a result of the new rules, some of the thrifts that had been involved in supervisory mergers found themselves dangerously near, or even below, minimum capital requirements. Many of those thrifts, including Transohio, sued the banking regulators, claiming that Congress did not, and could not, change the capital accounting rules for thrifts with forbearance agreements. They argued, typically, that FIRREA, contrary to the OTS' interpretation, exempted thrifts with forbearance agreements. And they argued, alternatively, that the forbearance agreements gave the thrifts a contractual right to count goodwill as capital, and that the breach of that contract violated common law rules as well as the Constitution; barring the thrifts from counting goodwill as capital, they said, was a taking of property without just compensation and (a few alleged) a deprivation of property without due process of law. Although the thrifts have prevailed in the Claims Court and in several district courts (while losing in others), the four Courts of Appeals that have considered some or all of the issues have ruled against them. See Carteret Savings Bank, FA v. OTS, 963 F.2d 567 (3rd Cir.1992); Far West Fed. Bank v. Director, OTS, 951 F.2d 1093 (9th Cir.1991); Guaranty Fin. Servs., Inc. v. Ryan, 928 F.2d 994 (11th Cir.1991); Franklin Fed. Sav. Bank v. Director,

*OTS,* 927 F.2d 1332 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). Today, we join the Third, Sixth, Ninth and Eleventh Circuits and reject a thrift's claims.

Before us is the district court's denial of Transohio's preliminary injunction motion. Because we agree that Transohio is unlikely to prevail on the merits, we affirm the district court's decision. We find that Congress, in FIRREA, required the OTS to apply the new capital rules to all FSLIC-insured savings institutions, including those with forbearance agreements. And we find that Transohio's agreement with FSLIC and the Bank Board, while it may have barred the banking regulators from applying different capital accounting rules to Transohio as long as it was a matter of agency discretion, did not prevent Congress from establishing new capital accounting rules and ordering federal agencies to enforce them. The contract documents did not waive Congress' regulatory power, and the agencies, in any event, lacked the authority to waive Congress' regulatory power. Because we conclude that Transohio did not have a property right that trumped Congress' power to regulate, we need not, and do not, decide whether the due process or takings clauses would immunize a thrift that possessed such a right from subsequent regulatory legislation.

Before we address the merits, we consider knotty questions of sovereign immunity and jurisdiction, matters not discussed below. We find that the Administrative Procedure Act waives sovereign immunity for Transohio's due process and statutory claims against the OTS, and that the district court properly exercised jurisdiction over those portions of Transohio's lawsuit. We find, however, that the district court did not have jurisdiction over Transohio's pure contract claims because only the Tucker Act, 28 U.S.C. § 1491(a)(1), waives sovereign immunity for Transohio's contract claims, and the Tucker Act provides for jurisdiction in the Claims Court alone.

## I. BACKGROUND

### A. *The S & L Crisis and FIRREA*

From the beginnings of the savings and loan industry in the 19th century, when savings and loan associations were called "building societies" and then "building and loan associations," the primary function of the industry has been to finance the purchase and construction of housing. JAMES J. WHITE, BANKING LAW 41 (1976). Like commercial banks, savings and loan associations were almost entirely unregulated until the Great Depression—the first great S & L Crisis—when many thrifts teetered and then failed, foreclosing on home mortgages and spending away customers' deposits. Ever since, the thrift industry has been subject to pervasive federal support, supervision and regulation in order to ensure the availability of home loans and to protect depositors' funds. *See* MILES A. COBB, FEDERAL REGULATION OF DEPOSITORY INSTITUTIONS ¶ 1.03[3], pp. 1–8–1–9, 1–13–1–14 (1984).

Congress created the Federal Home Loan Bank Board in 1932 and FSLIC in 1934 to charter thrifts, insure deposits, and generally to regulate the industry. *See* Federal Home Loan Bank Act, Pub.L. No. 72–304, 47 Stat. 725 (1932); Home Owners' Loan Act of 1933, Pub.L. No. 73–43, 48 Stat. 128 (1933); Title IV of the National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934). Since the 1930s, Congress and the agencies it created have "promulgated regulations governing 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.'" *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 145, 102 S.Ct. 3014, 3018, 73 L.Ed.2d 664 (1982) (citation omitted). Through legislation and regulations, Congress and the agencies have developed guidelines for lending and investment activities, imposed reporting and record-keeping requirements, established liquidity standards, at times limited interest paid on deposits, and authorized the closing of thrifts and appointment of receivers. Capital requirements—both the minimum required and the items that can be counted as capital—have long been part

of the regulatory scheme. The Bank Board and FSLIC set minimum capital requirements upon the agencies' creation, requirements that have been the subject of numerous statutory and regulatory changes over the years. *See, e.g.,* Garn–St Germain Depository Institutions Act, Pub.L. No. 97–320, 96 Stat. 1469 (1982); Depository Institutions Deregulation and Monetary Control Act, Pub.L. No. 96–221, 94 Stat. 132 (1980); Emergency Home Finance Act, Pub.L. No. 91–351, 84 Stat. 450 (1970). Since the Depression, federal involvement in the thrift industry has become so extensive that Congress considers the industry "a federally-conceived and assisted system to provide citizens with affordable housing funds." H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 292 (1989), *reprinted in* 1989 USCCAN 86, 88 (*"House Report"*).

The recent S & L crisis had its roots in the high interest rates and high inflation of the late 1970s and early 1980s. Savings and loan associations had traditionally turned a predictable profit by taking advantage of the spread between the interest rate they paid on deposits, a rate set by regulation, and the somewhat higher rate they received from borrowers, primarily mortgage borrowers. But high interest rates drove depositors to move their money from thrifts to higher-paying investments, such as money market mutual funds, and rising inflation resulted in a higher cost of funds to thrifts. The thrifts, meanwhile, remained locked into long-term, relatively low-yielding, fixed-rate mortgages. The result was severe operating losses beginning in the early 1980s. *See* S.Rep. No. 19, 101st Cong., 1st Sess. 7 (1989) (*"Senate Report"*); *House Report* at 294, 1989 USCCAN at 90.

For most of the 1980s, Congress and the federal regulators tried to address the problems of the thrift industry and the resulting pressure on the federal savings and loan insurance fund by, among other things, deregulating interest rates, lifting restrictions on thrifts' use of funds and, relevant here, reducing minimum capital requirements and permitting thrifts to count various intangible assets as regulatory capital. *See House Report* at 296–98, 1989 USCCAN at 92–94. One attempt to reduce the growing costs to government of the thrift industry's problems involved supervisory mergers. Regulators encouraged healthy thrifts to acquire insolvent ones apparently in the hope that doing so would spare the government the costs of liquidating the failing thrifts and paying off depositors. *See House Report* at 298, 1989 USCCAN at 94. Banking regulators at the time estimated that the cost to the government of a supervisory merger could be half that of a liquidation. *See, e.g., Winstar Corp. v. United States,* 21 Cl.Ct. 112, 113 (1990). A government report prepared several years later, however, suggests that regulators underestimated the costs to government of mergers and that, over time, the costs of mergers and liquidation would be about the same. *See* General Accounting Office, Troubled Financial Institutions: Solutions to the Thrift Industry Problem 52–54 (1989) (GAO/GGD–89–47). To facilitate the mergers, FSLIC and the Bank Board contributed financial assistance to the acquiring thrifts, over $100 million in the case before us. And the agencies granted capital or accounting forbearances, permitting the acquiring thrifts to count toward minimum capital requirements intangible assets resulting from the mergers (assets we refer to as "goodwill"), and allowing the thrifts to amortize those intangible assets over an extended period.

The measures taken during the mid–1980s to address the declining condition of the savings and loan industry proved severely counterproductive, Congress and the President later found, actually aggravating the decline. Relaxed capital requirements spurred risky loans and investments that never produced promised profits, and intangible assets did not cushion against thrift losses. *See House Report* at 298–99, USCCAN at 94–95; *Senate Report* at 9. According to President Bush, "[i]nadequacies in capital rules [and] accounting practices" were among the "fundamental causes of [the savings and loan] disaster." Letter from Pres. Bush to Rep. Robert H. Michel, Republican Leader of the House of

Representatives, June 14, 1989, *reprinted in* 135 CONG.REC. H2685 (daily ed. June 15, 1989) ("*President's Statement*"). Although the S & L crisis had many causes, "[t]o a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts." *House Report* at 310, 1989 USCCAN 86, at 106. Treasury Secretary Nicholas Brady told Congress that the savings and loan crisis "is the resul[t] of an industry that collectively has not been adequately capitalized. We have learned a valuable lesson: deposit insurance simply will not work without sufficient private capital at risk and up front." Quoted in H.R.Rep. No. 54(V), 101st Cong., 1st Sess. 24, *reprinted in* 1989 USCCAN 86, 397, 407 (hereinafter "*Judiciary Comm. Report*").

By the end of the decade, "[c]onsumer confidence in the nation's savings and loan system [was] declining rapidly," and Congress and the President recognized the powerful need for remedial legislation that would "restore public confidence in the savings and loan industry in order to ensure a safe, stable, and viable system of affordable housing finance." *House Report*, at 305, 307, 1989 USCCAN at 86, 102, 103; *see also President's Statement*, 135 CONG.REC. H2685 (daily ed. June 15, 1989) (urging Congress to adopt legislation "to ensure the safety and soundness of the thrift industry" and "to protect the trust of insured depositors"). The result was FIRREA—the Financial Institutions Reform, Recovery, and Enforcement Act—which was adopted by Congress and signed by the President in 1989.

FIRREA was adopted, in part, "[t]o improve the supervision of savings associations by strengthening capital, accounting and other supervisory standards" and to "promote, through regulatory reform, a safe and stable system of affordable housing finance." § 101(1) & (2), 103 Stat. 187 (1989), 12 U.S.C. § 1811 note. The law provided over $100 billion to close insolvent thrifts and recapitalize the insurance fund protecting thrift deposits. It reorganized the federal thrift regulatory scheme by abolishing FSLIC and the Bank Board, and transferring their functions to the newly-created OTS and other agencies. And, crucial for this case, FIRREA ordered the OTS to establish "uniformly applicable capital standards for savings associations," 12 U.S.C. § 1464(t)(1)(A), required "all savings associations" to meet or exceed the new capital standards, *id.* § 1464(s), and placed strict limits on the amounts of supervisory goodwill that could qualify as capital toward the minimum standards, *id.* §§ 1464(t)(1)–(3) & (9). FIRREA empowered the OTS to enforce the new rules by issuing capital directives with operating restrictions to thrifts failing to comply with the capital requirements, *id.* § 1464(t)(6)(B)(i), and by appointing "ex parte and without notice" a conservator or receiver for thrifts with "substantially insufficient capital." *id.* §§ 1464(d)(2)(A)–(E). Implementing the new capital requirements, the OTS promulgated regulations and issued an order requiring all FSLIC-insured savings institutions to abide by the new rules, including those that had obtained capital or accounting forbearances from the OTS' predecessor agencies. *See* 54 Fed.Reg. 46,845 (1989); *Thrift Bulletin* 38–2 (Jan. 9, 1990).

The purpose of the new capital requirements was two-fold, according to the Conference Report on FIRREA: first, they would "provide the self-restraint necessary to limit risk-taking by Federally insured savings associations," and second, they would "protec[t] the deposit insurance fund by providing a cushion against losses if the institution's condition deteriorates." H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. (1989), *reprinted in* 1989 USCCAN 86, 432, 443 ("*Conference Report*"). During debate on FIRREA, legislators repeatedly emphasized the importance of the new capital requirements. "[R]aising the capital standard is the strongest and most critical requirement in the conference report," Sen. Chafee said; "it is the backbone of the legislation." 135 CONG.REC. S10200 (daily ed. Aug. 4, 1989); *see also id.* at S10205 (Sen. Riegle) (placing the new capital requirements at the "very heart" of FIRREA); *id.* at S10193 (Sen. Dole) (de-

scribing the "new capital standards [as] perhaps the most important provisions in this bill").

Goodwill, meanwhile, was "one of the remaining poisons of the savings and loan industry." *Id.* at H2710 (daily ed. June 15, 1989) (Rep. Price). According to the chairman of the House Banking Committee, "[t]he bottom-line fact is that supervisory goodwill is not tangible capital. It protects neither the insurance fund nor the taxpayers." *Id.* at H2555 (daily ed. June 14, 1989) (Rep. Gonzalez); *see also id.* at H2571 (Rep. Barnard) ("Goodwill is not cash. It is a concept, and a shadowy one at that. When the Federal Government liquidates a failed thrift, goodwill is simply no good. It is valueless. That means, quite simply, that the taxpayer picks up the tab for the shortfall."); *id.* at H2706–07 (daily ed. June 15, 1989) (Rep. Wylie) (stating that the managers of a thrift operating on the basis of goodwill "are not really gambling with their own money.... They are gambling with the public's money"). Legislators also repeatedly expressed concern about goodwill in the hands of thrifts that participated in supervisory mergers. According to one group of Representatives, for example, "an overriding public policy would be jeopardized by the continued adherence to arrangements which were blithely entered into by the FSLIC." *House Report* at 545, *reprinted in* 1989 USCCAN at 86, 336 (Supplemental Views Concerning Forbearances from Industry–Wide Capital Standards of Reps. Schumer, Morrison, Roukema, Gonzalez, Vento, McMillen and Hoagland); *see also infra* at 615–17 (discussing legislators' views of FIRREA's affect on forbearance agreements).

Against this backdrop, we turn to the specific history of the transactions in this case.

### B.  *Transohio and Its Supervisory Mergers*

In August of 1986, Transohio Savings Bank, a large, Ohio-based thrift, and its holding companies acquired two insolvent thrifts, Citizens Federal Savings and Loan Association and Dollar Savings Bank, through mergers supervised and financially assisted by FSLIC and the Bank Board. The mergers followed months of negotiations between Transohio and the two government agencies, negotiations that began, Transohio says, when the agencies "solicited" the thrift's participation.

The transaction produced several documents detailing the terms of the mergers. FSLIC and Transohio signed an "Assistance Agreement" dated August 29, 1986, governing the terms of the agency's financial contribution. The Bank Board adopted a resolution approving the mergers, FHLBB Res. No. 86–864 (Aug. 21, 1986) ("Bank Board Resolution"), and it issued a forbearance letter to the thrift dated September 10, 1986. The documents, which are discussed in greater detail below, show that FSLIC gave Transohio $107.5 million in direct financial assistance plus millions more in asset purchases. The documents also contain statements by FSLIC and the Bank Board permitting Transohio to count as regulatory capital intangible assets resulting from the mergers. The agencies, for example, allowed Transohio to count the $107.5 million cash contribution not only as a tangible asset, but also as an intangible one. Generally accepted accounting principles would have required Transohio to subtract $107.5 million from the total goodwill created in the mergers. *See* ACCOUNTING FOR CERTAIN ACQUISITIONS OF BANKING OR THRIFT INSTITUTIONS, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 72, ¶ 9 (Fin. Accounting Standards Bd. 1982); APB Opin. No. 16, ¶ 87. FSLIC and the Bank Board, however, allowed Transohio to refrain from subtracting that amount from goodwill, and to count it as capital for purposes of meeting minimum capital requirements, amortizing the goodwill over 25 years. As a result of the mergers, Transohio took over many millions of dollars in liabilities from the insolvent thrifts. Absent the accounting treatment promised by the government agencies, Transohio says, the thrift would not have met minimum capital standards upon completion of the mergers.

FIRREA became law three years after Transohio's supervisory mergers, and the OTS announced it would apply the new

capital rules to thrifts in Transohio's position prospectively—that is, thrifts with forbearance agreements would not be penalized for having counted goodwill as regulatory capital prior to FIRREA's passage, but they would from that point forward have to comply with the new rules. FIRREA, under the OTS regulations, does not affect Transohio's ability to count as regulatory capital the $107.5 million in cash assistance it received during the mergers, but the law bars the thrift from also counting as regulatory capital the same $107.5 million in goodwill.

After the OTS issued its regulations, Transohio sued the OTS and the FDIC in district court below, claiming that the banking regulators improperly interpreted FIRREA to apply to thrifts with forbearance agreements. Transohio also claimed that it had a contractual right to count goodwill as capital, and that forbidding such accounting constituted a breach of contract, a deprivation of property without due process of law, and a taking without just compensation.

Several months later, after the OTS says it became concerned about Transohio's finances, the agency issued an individual minimum capital requirement (IMCR) requiring Transohio to meet a new higher capital level; it also issued a notice of intent to issue a capital directive restricting certain of the thrift's activities. Transohio responded by seeking a preliminary injunction in district court against enforcement of the IMCR and the issuance of a capital directive.

The district court denied the preliminary injunction in a memorandum opinion. *See Transohio Savings Bank v. Director, OTS,* CA No. 90–1678, 1991 WL 201178 (D.D.C. Aug. 1, 1991) (mem. op.). The court held first that Congress had precluded judicial review of the process by which the OTS issues IMCRs and capital directives, a holding Transohio does not challenge. *Id.* at 8–14. As for the preliminary injunction, the district court looked to the well-established factors to be weighed: (1) plaintiffs' likelihood of success on the merits, (2) the threat of irreparable harm to

plaintiffs in the absence of injunctive relief, (3) the harm to defendants and others if injunctive relief is granted, and (4) the public interest. *Id.* at 14–15 (citing *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151 (D.C.Cir.1985)). The district court found that Transohio had no likelihood of success on the merits. Relying on decisions of the Sixth and Eleventh Circuits, the district court held that FIRREA's rules applied to thrifts in Transohio's position. *Id.* at 15–19. Barring Transohio from counting supervisory goodwill as capital does not amount to an unconstitutional deprivation or taking of the thrift's property, the court said, because Transohio's agreement with the banking regulators did not bar Congress from changing the law on goodwill. *Id.* at 19–20. Moreover, the court said, there could not have been a taking because Transohio should reasonably have expected that Congress might change capital rules to meet a growing crisis in the comprehensively regulated savings and loan industry. *Id.* at 20–21. The court also stated that the "only relief available" for a taking is compensation, not the equitable relief Transohio sought. *Id.* at 19.

Because Transohio's likelihood of prevailing on the merits "is nil," the court found "little need" to discuss the other factors of the preliminary injunction test. *Id.* at 21. The court stated, however, that Transohio failed to demonstrate irreparable, non-speculative harm, and that a public-interest balancing would have to take into account that the agencies are attempting to act in the best interests of Transohio, its investors and creditors, and the nation's taxpayers. *Id.* at 22. Transohio appealed.

The agencies below did not contest the district court's jurisdiction, and the district court did not address the issue (other than to suggest that the court had no power to award equitable relief on Transohio's takings claim). After oral argument before this Court, however, we ordered the parties to address the jurisdiction issues. The parties submitted supplemental briefs and appeared for reargument, with the agencies contending that the district court lacked jurisdiction to consider Transohio's claims

because Congress has not waived sovereign immunity for an action seeking to have the government specifically perform a contract.

## II. Sovereign Immunity and Jurisdiction

Transohio may sue its government regulators only if Congress has waived sovereign immunity for the lawsuit, and the thrift may bring its claims in federal district court only if Congress has provided for jurisdiction there. Waivers of sovereign immunity do not necessarily provide for jurisdiction in district court. The Tucker Act, for example, waives sovereign immunity for damage actions against the government, but provides for jurisdiction only in the Claims Court. 28 U.S.C. § 1491(a)(1).

If the Tucker Act contains the only waiver of sovereign immunity applicable to Transohio's claims, the district court would have had to dismiss the suit for lack of jurisdiction. Concluding that the Tucker Act in fact contains the only applicable waiver, at least one federal district court has dismissed a lawsuit similar to Transohio's for lack of jurisdiction. *See Northeast Savings, F.A. v. Director, OTS*, 770 F.Supp. 19 (D.D.C.1991). (Many federal courts have been able to avoid the jurisdiction problem because the thrifts before them did not raise a due process claim.) Transohio identifies two other waivers of sovereign immunity it says cover its suit: FIRREA (which provides for district court jurisdiction over matters reviewable under it); and the Administrative Procedure Act (which indirectly provides for jurisdiction in district court through the federal question jurisdiction statute and similar laws).

As we explain in detail below, we find that FIRREA does not aid Transohio, and that the APA does not waive sovereign immunity for the thrift's contract claims. The APA does, however, waive sovereign immunity for the thrift's statutory and due process claims; the district court had jurisdiction over those claims, as do we. We do not decide whether the district court had jurisdiction over Transohio's takings claim.

### A. *FIRREA*

■ 1. *The FDIC.* FIRREA carries forward the FDIC's longstanding power to "sue and be sued, and complain and defend, in any court of law or equity, State or Federal." 12 U.S.C. § 1819. The statute contains a broad waiver of sovereign immunity that would permit federal district courts to entertain suits against the FDIC—including, the Federal Circuit held, suits founded upon a contract. *See Far West Fed. Bank v. Director, OTS*, 930 F.2d 883, 888–89 (Fed.Cir.1991) (listing cases from eight Circuits). Unfortunately, the "sue and be sued" clause does not help here because Transohio's counsel, in oral argument in district court on the thrift's preliminary injunction motion, waived the thrift's claims for preliminary injunctive relief against the FDIC:

> *The Court*: So, in other words, you only want me to enjoin OTS? I can forget FDIC?
>
> *Mr. Cooper*: I believe that relief against OTS would be adequate, your honor.
>
> *The Court*: Well, we are not asking what you believe. We are asking what you seek. And you seek injunction against OTS only?
>
> *Mr. Cooper*: Yes, your honor.
>
> *The Court*: All right. So, we will forget FDIC. . . .

Transcript of Hearing on Motion for Preliminary Injunction at 5 (July 15, 1991). The district court plainly understood Transohio to have waived its claim for a preliminary injunction against the FDIC, stating later in oral argument that "as the plaintiff says, they're not seeking any relief against [the FDIC]," *id.* at 28, and in its ruling that "[p]laintiffs seek no relief from the FDIC," mem. op. at 1. Transohio's counsel failed to move during oral argument or afterward to correct any misimpressions. When he waived the thrift's claim against the FDIC, Transohio's counsel may well have been unaware of the jurisdictional significance of his action, but sympathy for his plight cannot allow us to revive his client's claim.

Because Transohio has waived its claim for preliminary injunctive relief against the FDIC, the thrift's contentions regarding

that agency are not properly before us. As a result, the FDIC "sue and be sued" clause in FIRREA cannot serve as a waiver of sovereign immunity or basis for jurisdiction in this appeal. We do not rule, we stress, that Transohio has waived its underlying claims against the FDIC. The agencies suggest that the FDIC was never properly a defendant in this case, but we leave resolution of that issue, and the accompanying sovereign immunity and jurisdiction issues, to the district court, if necessary.

■ 2. *The OTS.* Transohio has not waived its preliminary injunction claim against the OTS, and FIRREA provides that the Director of the OTS

shall be subject to suit ... by any Federal savings association or director or officer thereof with respect to any matter under this section or any other applicable law, or regulation thereunder, in the United States district court for the judicial district in which the savings association's home office is located, or in the United States District Court for the District of Columbia.

12 U.S.C. § 1464(d)(1)(A). FIRREA thus waives sovereign immunity for claims against the OTS and grants jurisdiction to federal district court in one of two locations, including the court below. But the OTS provision plainly aids only *"[f]ederal savings association[s]."* Transohio invokes the OTS "subject to suit" clause, even though its complaint describes itself as *state*-chartered. *See* Second Amended Complaint for Declaratory Judgment and Injunctive Relief 3–4; *see also* Brief of Appellants at (i). (The other appellants, Transohio's holding companies, are not aided by the "subject to suit" provision.) Aware of no canon of statutory construction that permits us to read "federal" as "state," we conclude that FIRREA does not waive sovereign immunity for Transohio's claims against the OTS.

Because Transohio's claims against the FDIC are not properly before us, and because FIRREA does not waive sovereign immunity for the thrift's claims against the OTS, FIRREA cannot serve as a waiver of sovereign immunity or basis for jurisdiction

here. We turn, therefore, to the second statute Transohio invokes, the APA.

B. *The Administrative Procedure Act*

■ In 1976, Congress amended the APA to waive sovereign immunity for suits seeking relief other than money damages from federal agencies or officials:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.

5 U.S.C. § 702. Under settled law, for claims permitted under the APA's waiver of sovereign immunity, jurisdiction is proper in the federal district court under the federal-question statute, 28 U.S.C. § 1331, the declaratory-judgment statute, *id.* § 2201–2202, or the mandamus statute, *id.* § 1361. *See Sharp v. Weinberger,* 798 F.2d 1521, 1523 (D.C.Cir.1986).

Whether § 702 of the APA justifies district court jurisdiction over Transohio's case depends on whether the thrift's claims fall under any of the three limitations on the APA's waiver of sovereign immunity. The APA excludes from its waiver of sovereign immunity (1) claims for money damages, (2) claims for which an adequate remedy is available elsewhere, and (3) claims seeking relief expressly or impliedly forbidden by another statute. We find, to summarize our conclusions, that Transohio's claims survive the first two limitations, but that only the thrift's statutory and due process claims survive the third. We consider the takings claim separately.

■ 1. *"Money Damages."* The first limitation on the APA's waiver of sovereign immunity appears in the portion of § 702 quoted above: the waiver does not apply to actions for "money damages," but

only to claims for specific relief. That is not an obstacle here because Transohio does not seek "money damages"—as the government agencies, by not addressing the money-damages limitation, appear to concede.

The thrift seeks declaratory relief (clearly not itself a request for money damages) and, in the alternative, specific performance of its contract with the banking regulators or rescission of the transaction. Specific performance is the classic example of specific relief; the remedy is available only when damages are inadequate. *See, e.g.,* 5A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1136, p. 95 (1964). Although rescission sometimes involves the payment of what the common law termed "damages," rescission of the sort Transohio seeks— undoing a complicated transaction—was traditionally regarded as specific relief. *See* DAN B. DOBBS, LAW OF REMEDIES § 4.3, p. 255 (1973) ("[A] rescission that requires ... a cancellation or amendment of any document normally is effected in equity courts."); *id.* § 9.4, p. 619. Neither specific performance nor rescission would result in the payment of money damages to Transohio from the Treasury. In fact, in the case of rescission, money would likely flow in the opposite direction; undoing the supervisory mergers would probably involve Transohio returning the millions of dollars it received from the Treasury.

■ 2. *"Adequate Remedy."* Under APA § 704, only "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The agencies contend that Transohio has an adequate remedy in the Claims Court under the Tucker Act and that, therefore, the APA does not authorize judicial review of the thrift's claims in district court. The Tucker Act, which waives sovereign immunity and provides for Claims Court jurisdiction over certain claims, states:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of

an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). Although the text of the Tucker Act contains no limitation on the type of relief it authorizes, "the Act has long been construed" as waiving sovereign immunity only for claims seeking damages, and not for those seeking equitable relief (except in very limited circumstances). *See Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 630, 34 L.Ed.2d 647 (1973) (citing *United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889)); ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 9.2 at 488 (1989) (describing the circumstances under which the Claims Court may grant equitable relief). Because the Claims Court cannot grant the equitable relief Transohio seeks—it cannot, for example, order specific performance or rescission—the "adequate remedy" limitation on the APA's waiver of sovereign immunity does not interfere with district court jurisdiction over Transohio's claims.

It is no response to suggest that Transohio could reframe its claim as one for damages and bring it in the Claims Court. That is precisely the "restrictive—and unprecedented—interpretation of § 704" that the Supreme Court rejected in its most recent case addressing the relationship between the APA and the Tucker Act, *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). Like the Court in *Bowen,* "[w]e are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id.* at 904, 108 S.Ct. at 2737.

■ 3. *"Expressly or Impliedly Forbids the Relief Sought."* Under APA § 702, sovereign immunity is not waived "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The agencies argue that because Transohio's case is contractual in nature the Tucker

Act impliedly forbids the relief Transohio seeks from the OTS and that, therefore, the APA does not waive sovereign immunity for the thrift's action.

The agencies are correct that courts of appeals have regarded Claims Court jurisdiction over contract claims against the government as exclusive, despite Congress' decision in 1976 to broaden the APA's waiver of sovereign immunity. Although nothing in the language of the Tucker Act suggests that a claim founded "upon an express or implied contract with the United States" should be treated differently than a claim "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department," courts have not interpreted the Tucker Act in line with its "literal reading." *Tennessee ex rel. Leech v. Dole,* 749 F.2d 331, 335 (6th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983) (Friendly, J.). While holding that Tucker Act jurisdiction is not exclusive for claims founded upon the Constitution, federal laws or regulations, this Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA. *See, e.g., Sharp v. Weinberger,* 798 F.2d 1521, 1523 (D.C.Cir.1986) (citing other cases).

As a result, we have declared that § 702 of the APA does not waive sovereign immunity for contract actions against the government. Section 702 "is by its terms inapplicable if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,' and the Tucker Act and Little Tucker Act impliedly forbid such relief." *Sharp v. Weinberger,* 798 F.2d at 1523 (citing *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1524 (D.C.Cir.1984) (en banc), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), and *id.* at 1553 (Scalia, J., dissenting)); *accord Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 893 (D.C.Cir.1985); *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C.Cir.1982). Under the cases, the Tucker Act impliedly

forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not. "The waiver of sovereign immunity in the Administrative Procedure Act does not run to actions seeking declaratory relief or specific performance in contract cases." *Sharp,* 798 F.2d at 1523. Accordingly, under this Court's decisions, if the case before us is a "contract case," the APA does not waive the sovereign's immunity from suit.

The agencies contend that Transohio has brought a "contract case" and that, therefore, the district court had no jurisdiction to hear it. The issue is more complicated than the agencies let on, however. The answer to the sovereign immunity and jurisdiction questions depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution. To resolve the sovereign immunity and jurisdiction questions, we must consider Transohio's claims individually, as this Court approached an analogous set of claims in *Sharp v. Weinberger,* 798 F.2d 1521 (D.C.Cir.1986), in an opinion authored by Judge Scalia.

*Sharp* involved a Department of Defense Directive requiring that members of the Ready Reserve who were also "key" federal employees be discharged or transferred to either the Standby or the Retired Reserve. Under the Directive, the Defense Department transferred to Standby Reserve Allen Sharp, who had been a Lieutenant Colonel in the Air Force Ready Reserve and who was also the Chief Judge of the U.S. District Court for the Northern District of Indiana. Chief Judge Sharp sued the Secretaries of Defense and the Air Force in federal district court, claiming, among other things, that the Defense Department was contractually bound to retain him in the Ready Reserve under the terms of a Ready Reserve Service Agreement; that the agreement gave him a vested property interest which the Defense Department sought to deny without due process;

and that the transfer was prohibited by a federal statute. For relief, Chief Judge Sharp asked for a declaration that the Directive breached the Agreement or, alternatively, that it was contrary to the statute; and an injunction enjoining the Defense Department from transferring him. *See Sharp*, 798 F.2d at 1521–23.

In structure, *Sharp* is much like the case before us. Plaintiffs in both assert that they had contracts with the government, contracts the government planned to breach. Plaintiffs in both assert that the contracts gave them a property interest, the denial of which the Constitution prohibits. Plaintiffs in both assert too that the government's proposed action is inconsistent with federal law. And plaintiffs in both seek injunctive and declaratory relief, not money damages.

The district court dismissed Chief Judge Sharp's suit on the merits. On appeal the main issue was jurisdictional and, putting aside the inconsequential intricacies, turned on whether Chief Judge Sharp had brought a Tucker Act case. Writing for this Court, Judge Scalia answered the question by dividing Chief Judge Sharp's claims into categories. One category was "[t]hat part of appellant's complaint and prayer seeking a declaration that he had a valid contract with appellees and an injunction requiring appellees to perform that contract." *Id.* at 1523. The district court, Judge Scalia wrote, lacked jurisdiction to hear that part of the complaint, the contract claim, because Tucker Act jurisdiction over contract claims was exclusive, and § 702 of the APA did not waive sovereign immunity. *Id.*

Over the other major category of Chief Judge Sharp's claims, Judge Scalia wrote, the district court properly took jurisdiction. The other category included appellant's claims "that his transfer would be contrary to regulations, statutes and the Constitution," and his request for "a declaration to that effect and an injunction of the transfer." *Id.* at 1523. As to those claims, "[t]he District Court properly exercised jurisdiction to consider appellant's claim that his reassignment would violate federal reg-

ulations, statutes and the Constitution." *Id.* at 1524. Tucker Act jurisdiction over those claims was not exclusive, and § 702 waived sovereign immunity. *Id.* at 1523–24.

■ The lesson of *Sharp*, we think, is straightforward: under § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court. Crucially, *Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government. The *Sharp* Court said that APA § 702 waived sovereign immunity for Chief Judge Sharp's due process claim even though that claim rested necessarily on the premise that his contract with the government gave him a constitutionally protected property interest. *See id.* at 1523. In addition, and also crucial, *Sharp* tells us that a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance. The *Sharp* Court ruled that § 702 waived sovereign immunity for Chief Judge Sharp's prayer for an injunction against his transfer, an order, in other words, compelling the Defense Department to abide by the terms of its agreement with Chief Judge Sharp. *Id.*

Our reading of *Sharp* is confirmed by this Court's earlier decision in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir.1982). There, the Court ruled that the district court had jurisdiction over a case brought by a government contractor seeking injunctive relief to prevent an alleged violation of the Trade Secrets Act through disclosure of information provided to the government, even though a crucial issue in the case was whether disclosure was consistent with the plaintiff's contract with the government. "[T]he mere fact that a court may have to rule on a contract issue," Judge Tamm wrote for the Court, "does not, by trigger-

ing some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have." *Id.* at 968; *see also Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 893 (D.C.Cir.1985) ("A court will not find that a particular claim is one contractually based merely because resolution of that claim requires some reference to a contract."); *accord Wabash Valley Power v. Rural Elec. Admin.,* 903 F.2d 445, 452 (7th Cir.1990); *North Side Lumber Co. v. Block,* 753 F.2d 1482, 1485–86 (9th Cir.), *cert. denied,* 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985); *Hahn v. United States,* 757 F.2d 581, 586–90 (3rd Cir.1985); *Tennessee ex rel. Leech v. Dole,* 749 F.2d 331, 335 (6th Cir.1984).

Nor, the *Megapulse* Court said, are federal district courts forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. *It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract.*

*Id.* at 971 (emphasis added).

To accept the agencies' position that none of Transohio's claims may be heard in federal district court, we would have to find that the Tucker Act "impliedly forbids" under APA § 702 not only district court review of pure contract claims but also of statutory and even constitutional claims that involve contracts. To put it in terms of the Tucker Act, we would have to find that statutory and constitutional claims involving contracts are "founded upon an express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In rejecting the agencies' position, we are mindful of the warning that federal courts not "subvert the congressional objectives underlying the enactment of [§ 702 of the APA] by allowing the government to give an overly expansive scope to the notion of claims 'founded upon' a contract." 17 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4101, p. 319 (1988).

In addition, to accept the agencies' position we would have to find that, in enacting the APA and the Tucker Act, Congress intended to preclude any review at all of constitutional claims seeking equitable relief, where the constitutional claims stem from contracts. But " 'where constitutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat them.' " *Bartlett v. Bowen,* 816 F.2d 695, 709 (D.C.Cir.1987) (quoting PAUL BATOR, PAUL MISHKIN, DAVID SHAPIRO & HERBERT WECHSLER, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 336 (2d ed. 1973)); *see also Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) (noting the " 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim").

In sum, although our prior cases oblige us to rule that the district court should not have taken jurisdiction over Transohio's contract claims, they also compel us to conclude that the district court properly heard the thrift's statutory and due process claims.

4. *Bowen v. Massachusetts.* Transohio argues that under the Supreme Court's decision in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), district court jurisdiction was proper even over the thrift's pure contract claims. *Bowen,* in Transohio's view, undoes our prior holdings that § 702 does not waive sovereign immunity for contract claims seeking specific relief.

Although Transohio's argument is not strong enough to overcome the clear instructions of our cases, we cannot deny its

force. Our prior holdings rest on the premise that the Tucker Act gives the Claims Court exclusive jurisdiction over all contract claims against the government. Otherwise, the Tucker Act could not "impliedly forbid" district court jurisdiction over contract claims. But in *Bowen,* the Supreme Court stated that Tucker Act jurisdiction is not exclusive, specifically rejecting conventional wisdom on that point:

> It is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000.... That assumption is not based on any language in the Tucker Act granting exclusive jurisdiction to the Claims Court. Rather, that Court's jurisdiction is "exclusive" only to the extent that Congress has not granted any other Court authority to hear the claim that may be decided by the Claims Court.

*Id.* at 910 n. 48, 108 S.Ct. at 2740 n. 48.

*Bowen* suggests that courts may have been reading the Tucker Act too broadly and the APA too narrowly. The plaintiff in *Bowen,* the state of Massachusetts, sought an injunction in district court compelling the Secretary of Health and Human Services to pay it for expenditures that were allegedly reimbursable under the Medicaid program. The Secretary raised a jurisdictional objection in response, arguing that the APA does not provide a sovereign-immunity waiver because the Claims Court had exclusive jurisdiction over Massachusetts' claim. The Supreme Court rejected the Secretary's "narrow construction of the 1976 amendment [to the APA]—which was unquestionably intended to broaden the coverage of section 702" and to "remove 'technical' obstacles to access to the federal courts." *Id.* at 896, 108 S.Ct. at 2733. The APA's "generous review provisions," the Court said, "must be given a hospitable interpretation." *Id.* at 904, 108 S.Ct. at 2737 (internal quotations and citations omitted).

There is no hint in *Bowen* that the broad scope of the APA's sovereign-immunity waiver, or the nonexclusivity of Claims Court jurisdiction, varies according to whether the claim involves a contract. Indeed, language in *Bowen* seems to imply the contrary. Describing the forms of monetary relief that were not "money damages" and thus were within the ambit of § 702, the Court mentioned " '*equitable actions* for monetary relief *under a contract,*' " suggesting that contract actions seeking equitable relief could indeed be heard in district court under the APA. *Id.* at 895, 108 S.Ct. at 2732 (emphasis added) (quoting Judge Bork's opinion in *Maryland Dep't of Human Res. v. HHS,* 763 F.2d 1441, 1446 (D.C.Cir.1985)).

Transohio makes a strong case that, after *Bowen,* the Tucker Act should not be read to "impliedly forbid" under the APA the bringing in district court of contract actions for specific relief, that such a result would be faithful to the text of the Tucker Act and the APA, and sensible. Nothing in the language of either the Tucker Act or the APA requires special treatment for contract claims. Indeed, less-frequently cited portions of the Tucker Act show that Congress knew how to make Claims Court jurisdiction exclusive for contract claims. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(3). Moreover, as Transohio says, reading § 702 as waiving sovereign immunity for contract claims seeking specific relief would seem to establish a coherent and complementary regime in which the Claims Court and federal district courts share a body of substantive law, but where the appropriate forum is determined by the relief sought: suits against the government for damages go to Claims Court, while those seeking specific relief go to district court. (The Federal Tort Claims Act, we should point out, would remain an anomaly: it permits some damage suits in federal district court. *See* 28 U.S.C. § 1346(b).) Such a reading would permit specific performance of government contracts in some circumstances. Although specific performance might not always be wise, it is hard to see the justification for an absolute bar on specific performance since specific performance is available when the contract breach rises to statutory or constitutional violation. The problem seems to be one of remedies, not jurisdiction.

*Bowen,* in sum, raises the possibility that in resolving the relationship between the APA and the Tucker Act, courts—including this one—have been leaning a bit too heavily toward the Tucker Act. Perhaps, as the Supreme Court suggested, " '[t]he policies of the APA [should] take precedence over the purposes of the Tucker Act.' " *Bowen,* 487 U.S. at 908 n. 46, 108 S.Ct. at 2739 n. 46 (quoting *Delaware Div. of Health and Social Servs. v. Department of HHS,* 665 F.Supp. 1104, 1117 (D.Del.1987)). Nevertheless, although *Bowen* invites us to reject our prior holdings, it does not compel us to do so. *Bowen* did not involve a contract and it did not address the "impliedly forbids" limitation on the APA's waiver of sovereign immunity. Without more certain direction from the Supreme Court, we decline to overrule this Court's very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief.

5. *Takings.* Transohio's takings claim requires separate treatment. The district court indicated that it did not have the authority to consider Transohio's takings claim because "[c]ompensation, not equitable relief, is the only relief available if the regulation were to work a taking." Mem. op. at 19. Transohio asks us to remand on this point, arguing that the district court's statement is inconsistent with this Court's decision in *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500 (D.C.Cir. 1984) (en banc), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). There, we recognized an exception to the general rule that takings claims must be brought as claims for money damages in the Claims Court: "when the monetary compensation available through the Tucker Act remedy is so inadequate that the plaintiff would not be justly compensated for the seizure of his property by the United States, an injunctive remedy is not barred by sovereign immunity;" moreover, we said, the district court has the power to award injunctive relief on a takings claim where "the gap between [the plaintiff's] injury and the monetary compensation available through a Tucker Act remedy is so great that an unconscionable injustice

would be worked." *Id.* at 1527, 1528 (relying on *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952)).

The agencies respond that the Supreme Court has stated recently that " 'takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.' " *Preseault v. ICC,* 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985)). But the *Preseault* Court also seemed to require, as a prerequisite to dismissing a takings claim filed in district court, that " 'the government has provided an *adequate* process for obtaining compensation.' " *Id.* at 194, 110 S.Ct. at 3121 (emphasis added) (quoting *Williamson County,* 473 U.S. at 194, 105 S.Ct. at 3121), *see also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1019, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (finding, before sending a takings claim to the Claims Court, that "an *adequate* remedy for the taking exists under the Tucker Act") (emphasis added). And the Supreme Court, since *Youngstown,* has considered the merits of takings claims that were not brought first in the Claims Court. *See, e.g., Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 54–56, 106 S.Ct. 2390, 2397–98, 91 L.Ed.2d 35 (1986). These cases suggest that the district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court remedy is "so inadequate that the plaintiff would not be justly compensated." *Ramirez de Arellano,* 745 F.2d at 1527.

Nevertheless, in light of our ruling on the merits in this case, we need not remand for the district court to consider the adequacy of Transohio's Claims Court remedy. As we discuss below in the context of Transohio's due process claim, the thrift did not receive from the banking regulators a right that defeats Congress' power to change the law on goodwill accounting.

Accordingly, Transohio has no property interest that could be unconstitutionally taken. Because Transohio cannot prevail on its takings claim on the merits, a remand would be pointless.

### III. THE MERITS

■ We review a district court's weighing of the four preliminary injunction factors under the highly deferential "abuse of discretion" standard, *see, e.g., Las Vegas v. Lujan,* 891 F.2d 927, 931 (D.C.Cir. 1989)—except that to the extent the district court's decision hinges on questions of law our review is " 'essentially *de novo,*' " *id.* (citation omitted). The district court's denial of Transohio's preliminary injunction motion rested on the court's conclusion that Transohio had no likelihood of success on the merits; because that conclusion rested primarily on judgments of law, we review it "essentially *de novo.*"

Transohio could prevail on the merits of its underlying case in one of two ways: (1) the thrift could show that FIRREA's new rules for goodwill do not apply to thrifts that had obtained capital or accounting forbearances from banking regulators during supervisory mergers; or (2) the thrift could show that its agreement with the banking regulators gave it an irrevocable property right to count goodwill as capital, and that the Constitution forbids Congress from changing the rules. The district court found that Transohio was unlikely to prevail on either argument. We agree.

### A. *Transohio's Statutory Claim*

■ Transohio contends that FIRREA does not abrogate pre-existing forbearance agreements, and that the OTS therefore improperly applied the new capital rules to it and other thrifts in its position. Relying on decisions of the Sixth and Eleventh Circuits, the district court found that Transohio was unlikely to prevail on this statutory claim. We see no error in the district court's conclusion which, we note, predated like-minded Third and Ninth Circuit decisions.

The OTS, which interpreted FIRREA's new capital rules to apply to all thrifts, asks us to resolve the statutory issue by according the agency's interpretation *Chevron* deference. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We are reluctant to comply. This Court has expressed concern about deferring to an agency interpretation of an agreement to which the agency is a party, *see National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), and we think the same concern applies to an agency interpretation of a statute that will affect agreements to which the agency is party. In *National Fuel Gas,* Judge Bork explained for the Court that "deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." *Id.* We see the same danger when, as here, an agency interprets a statute as abrogating existing agreements.

Moreover, as the Supreme Court recently reminded us, "[t]he starting point for interpretation of a statute" is not the agency's interpretation but " 'the language of the statute itself.' " *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990) (citation omitted). " 'Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Id.* (citation omitted). In our view, FIRREA's language clearly conveys Congress' intention to apply the new capital rules to all thrifts, including those with forbearance agreements; and the legislative history, rather than reflecting an intention to the contrary, leaves no doubt at all about Congress' desires. When the OTS promulgated regulations requiring all thrifts to phaseout goodwill, the agency was not exercising challengeable discretion, but merely carrying out specific orders from Congress.

Section 301 of FIRREA instructs OTS to "prescribe and maintain *uniformly applicable* capital standards for savings associations," 12 U.S.C. § 1464(t)(1)(A) (emphasis added), and to "require *all* savings associations" to meet the minimum. *Id.*

§ 1464(s)(1) (emphasis added). The natural reading of the statutory language is that the new rules apply "uniformly" to "all" thrifts, as the district court concluded. The subsection of FIRREA instructing "eligible savings association[s]" to phaseout "qualifying supervisory goodwill," moreover, contains no exceptions to the textual requirement that the new capital standards apply uniformly to all thrifts. *See id.* § 1464(t)(3)(A). Nor do any exceptions appear in the definitions of "eligible savings association" or "qualifying supervisory goodwill." *See id.* §§ 1464(t)(3)(B) & 1464(t)(9)(B). In fact, as the Third Circuit observed, the definition of "qualifying supervisory goodwill" contains strong evidence that Congress intended the new rules to apply to thrifts with forbearance agreements. "[Q]ualifying supervisory goodwill" is defined as supervisory goodwill existing on April 12, 1989, amortized on a straight line basis over the shorter of 20 years or "the remaining period for amortization in effect on April 12, 1989." *Id.* § 1464(t)(9)(B). "There would have been no reason to refer to the 'remaining period for amortization in effect' if the new provisions were inapplicable to previously acceptable supervisory goodwill." *Carteret,* at 576. Section 301 does contain three narrow exceptions to its requirements on goodwill, subsections 5(t)(6)(C), 5(t)(7), and 5(t)(8), but none apply to thrifts with forbearance agreements. Given the canon of statutory construction that "when Congress explicitly enumerates exceptions to a general scheme, exceptions not explicitly made should not be implied," *Far West,* 951 F.2d at 1097 (citation omitted), those exceptions prove the rule of uniform applicability.

Transohio finds in § 401 of FIRREA an exception it says applies to thrifts with forbearance agreements. But we agree with the Third, Sixth, Ninth and Eleventh Circuits, and the district court below, that § 401 does not apply to the agreements at issue. Section 401(g) states:

(G) SAVINGS PROVISIONS RELATING TO FHLBB.—

(1) EXISTING RIGHTS, DUTIES, AND OBLIGATIONS NOT AFFECTED.—Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owner's Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act), and

(B) existed on the day before the date of the enactment of this Act.

12 U.S.C. § 1437 note. Because "subsection (a)" does nothing other than abolish FSLIC and the Bank Board, it is hard to see how § 401 could apply to Transohio's forbearance agreement. "[T]he injury that [the thrift] complains of is not the result of subsection (a)," as the Eleventh Circuit explained. "If Congress had not included the supervisory goodwill phase-out in FIRREA, [the thrift] would have suffered no injury. But if Congress had included the phase-out but not abolished the Bank Board and the FSLIC, [the thrift] would be in the same predicament as now." *Guaranty,* 928 F.2d at 1003; *accord Carteret,* at 577; *Far West,* 951 F.2d at 1098; *Franklin,* 927 F.2d at 1339. (We note that Transohio has not advanced an argument that other courts have rejected, that other provisions of FIRREA exempt thrifts with forbearance agreements. *See, e.g., Far West,* 951 F.2d at 1098.)

Transohio argues nevertheless that the statutory language is not clear enough, advancing an unmistakability rule under which Congress will not be held to have abrogated pre-existing rights unless it does so in unambiguous terms. Even if that unmistakability rule applies (and the Third Circuit has concluded that it does not, *see Carteret,* at 581), it would not aid Transohio—first, because the statute is sufficiently clear to overcome any unmistakability requirement; and second, because (as we find below) the forbearance agreement did not give Transohio a right that trumped Congress' power to legislate new requirements.

Transohio might be able to prevail on its statutory claim if FIRREA's legislative his-

tory strongly supported the thrift's interpretation. We find, however, that the "legislative history cannot overcome the strong presumption "that the legislative purpose is expressed by the ordinary meaning of the words used." *Ardestani v. INS*, — U.S. —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) (internal quotations and citations omitted). Supporters and opponents of the goodwill phaseout provision shared the view that it applied to all thrifts, including those that participated in supervisory mergers. The issue was the subject of much debate. Opponents charged that with § 301 (the phaseout provision) Congress "has reneged on the agreements that the government entered into concerning supervisory goodwill." *House Report* at 86, 498, 1989 USCCAN at 293–94 (Additional Views of Reps. Annunzio, Kanjorski, and Flake). Defending the broad reach of the legislation, supporters maintained that preserving forbearance agreements, "which were blithely entered into by the FSLIC," would jeopardize "an overriding public policy." *Id.* at 545, *reprinted in* 1989 USCCAN at 86, 336 (Supplemental Views Concerning Forbearances from Industry-wide Capital Standards of Reps. Schumer, Morrison, Roukema, Gonzalez, Vento, McMillen and Hoagland).

Like the Banking Committee, the House Judiciary Committee, to which FIRREA was also referred, debated whether Congress should apply new capital standards to thrifts with forbearance agreements, with both sides agreeing that the bill did just that. Rep. Hyde expressed disappointment that the Committee rejected his amendment that would have required hearings before banking regulators could apply the new standards to thrifts with forbearance agreements. *Judiciary Comm. Report* at 27, 1989 USCCAN at 410. Rep. Schumer applauded the Committee's rejection of that amendment and others that would have allowed the inclusion of supervisory goodwill in regulatory capital. "[A]llowing undercapitalized thrifts to count gimmicks as capital does not make them any better capitalized nor any less of a threat to the taxpayers," Rep. Schumer said; the amendments would have defeated

FIRREA's "primary purpose." *Id.* at 24–25, 1989 USCCAN at 86, 407–408.

During floor debate on the bill, members of the House again clashed over the new rules for supervisory goodwill, with many representatives on both sides stating that the new rules applied to the thrifts that had received capital forbearances and "*[n]obody* express[ing] the view that FIRREA did not abrogate forbearance agreements regarding supervisory goodwill." *Franklin*, 927 F.2d at 1341 (emphasis in original). Responding to those who argued against abrogating forbearance agreements, such as Rep. Ackerman, *see* 135 CONG.REC. H2783 (daily ed. June 15, 1989), and Rep. Crane, *see id.* at H2706, Rep. Rostenkowski said "the Federal Government should be able to change requirements when they have proven to be disastrous and contrary to the public interest. The contracts between the savings and loan owners when they acquired failing institutions in the early 1980s are not contracts written in stone." *Id.* at H2717; *see also Guaranty*, 928 F.2d at 1005–06 (reproducing similar statements by other representatives). There is no hint in the Congressional Record that any member of Congress thought that FIRREA's savings provision, § 401(g), or any other section of FIRREA, exempted forbearance agreements.

Those comments came during debate on two proposed floor amendments to FIRREA. Rep. Quillen proposed to exempt from the new goodwill rules thrifts that had received capital forbearances. *See* 135 CONG.REC. H2701 (daily ed. June 15, 1989). Rep. Quillen withdrew his amendment in favor of a milder one offered by Rep. Hyde (similar to the one he offered in committee) that would have granted the thrifts a right to a hearing before the OTS applied the new rules to them. President Bush "adamantly oppose[d]" both amendments because "[g]iving recognition to goodwill as capital or creating procedural changes that could have the same effect is not justifiable." *President's Statement, reprinted in* 135 CONG.REC. H2686 (daily ed. June 15, 1989). "Each of the amendments to the

tough capital standards proposed by the Banking Committee would render this bill unacceptable to me." *Id.*

The amendments, President Bush's statement in opposition to them, the comments of congressional supporters and opponents of the amendments, and the committee reports demonstrate conclusively that all concerned believed that FIRREA means what it says—that the new capital standards apply "uniformly" to "all savings associations." Although legislators disputed whether it was a good idea for Congress to apply the new rules to thrifts with forbearance agreements, all agreed that, as Rep. Hyde said, "Congress [in FIRREA] is telling these same thrifts that they cannot count this goodwill toward meeting the new capital standards." *House Report* at 27, 1989 USCCAN at 86, 410. The savings and loan industry mounted "a tough"—but ultimately ineffective—"lobbying campaign" to exempt forbearance agreements. Nathanial C. Nash, Savings Bill Appeal Made by President, N.Y. TIMES, June 15, 1989, at D1, D6. We cannot give the thrift industry the victory that eluded it on Capitol Hill.

### B. *Transohio's Constitutional Claims*

Despite FIRREA, Transohio could prevail on the merits of its underlying case if it could win on its constitutional claims. (For the reasons discussed above, we have before us only the thrift's due process claim.) Transohio argues that "the government entered into a binding contract" with it in which "the government knowingly and deliberately made a contractually binding promise" that Transohio could count goodwill as regulatory capital, and that "the federal government cannot [now] repudiate its own obligations under the contract" because the Fifth Amendment forbids it from doing so. Brief of Appellants at 19, 20, 25. Transohio's repeated references to "the government" as the other party to the contract obscure the difficult questions the thrift's constitutional claims pose: whether the *executive agencies* entered into a contract that bound *Congress*, and whether the executive agencies had the *power* to enter into a contract that bound Congress.

We are persuaded that the answer to each of those questions is no, and that the district court therefore correctly found that Transohio was unlikely to prevail on the merits of its constitutional claims.

■ 1. *The Contract.* Transohio identifies three documents it says comprise the parties' contract and which it says give the thrift a right to count goodwill as capital regardless of future congressional action. The first is the 57–page Assistance Agreement, which governs FSLIC's cash contribution to the mergers, and contains the following statement:

> This Agreement, together with any contemporaneous interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties relating to other forms or assistance from [FSLIC] in respect of the mergers, excepting only any resolutions or letters issued contemporaneously with this Agreement by the [Bank Board] or [FSLIC].

*Assistance Agreement* at 45. The Agreement also states that generally accepted accounting principles control the accounting of the mergers, "except that where such principles conflict with ... any resolution or action of the BANK BOARD approving, or adopted concurrently with, this Agreement, then ... such resolution or action shall govern." *Id.* at 40.

The second document is the 10–page Bank Board Resolution, adopted eight days before the Assistance Agreement, approving the mergers and setting the Bank Board's terms of approval. The Resolution permits specific "departure[s] from GAAP"—namely, "[p]ush-down accounting shall be used to reflect the Citizens and Dollar Mergers on the books of Transohio," and "[t]he cash contribution by the FSLIC to Transohio, pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked a direct credit to Transohio's net worth." *Bank Board Resolution* at 8. The Resolution also provides that "[t]he value of any intan-

gible assets resulting from the Citizens and Dollar Mergers shall be amortized by Transohio over a period of 25 years by a straight line method." *Id.* at 9. The third document Transohio identifies is the forbearance letter, but we see nothing relevant in it, and Transohio points to nothing.

The agencies on appeal contest Transohio's assertion that the documents reflect the existence of a binding contract. We find that position puzzling, given their counsel's sensible concession below that the Assistance Agreement "looks like a contract. It smells like a contract. It is a contract." Transcript of Hearing on Motion for Preliminary Injunction at 46 (July 15, 1991). That contract, according to the plain language of the Assistance Agreement, incorporates the Bank Board resolution. We agree with Transohio, moreover, that the circumstances of the mergers support a finding that the transaction reflected a voluntary bargain, the terms of which were freely negotiated by the parties and binding on them. The agencies had no power to compel Transohio to purchase the insolvent thrifts; nor do the banking regulators' promises to Transohio amount to a mere benefit bestowed on the thrift by the largesse of the government. By absorbing the insolvent thrifts, Transohio gave the agencies something they wanted; we may infer that the agencies gave Transohio something in return. The question is what.

The agencies say that they gave Transohio money—over $100 million in cash and millions more in asset purchases. True enough, but contrary to the agencies' argument, the fact that they gave Transohio money does not mean that money is all they gave it. As a matter of contract law, the agencies' argument is dubious; it begs the question of whether the benefit at issue was part of the deal by pointing to some other benefit conferred.

We think the documents strongly suggest that, in addition to money, the agencies gave Transohio some ability to count as regulatory capital the intangible assets created by the mergers. At the time of the deal, it is undisputed, the banking regulators had the discretion to allow or disallow the inclusion of goodwill in capital, and the documents indicate that the agencies promised they would allow Transohio to include goodwill. But Transohio must show much more to prevail: it must show, at the threshold, that the agencies gave Transohio the right to count goodwill as capital not only as long as Congress left the matter to agency discretion, but even if Congress forbade such accounting.

We are persuaded that the contract does not include the broader promise, that the agreement did not grant Transohio a release from exercises by Congress of its sovereign regulatory power. In concluding as a matter of law that the contract does not give Transohio the right it now asserts, we apply "the rule of construction laid down by the Supreme Court, that one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms." *Western Fuels-Utah, Inc. v. Lujan*, 895 F.2d 780, 789 (D.C.Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990).

The "unmistakability" doctrine is a special rule of contract interpretation that applies to contracts with the government. The doctrine dates back to the early 19th century, when Chief Justice Marshall provided its justification. The government, Chief Justice Marshall wrote for the Court in a case concerning the government's taxing power, may enter binding contracts when it finds "a consideration sufficiently valuable to induce a partial release" of its sovereign powers. *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 560, 7 L.Ed. 939 (1830). "[B]ut as the whole community is interested in retaining [the sovereign power] undiminished," the Chief Justice wrote, "that community has a right to insist, that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear." *Id.* Relying on *Billings*, the Supreme Court has often applied its "rule of construction [that] neither the right of taxation, nor any other power of sovereignty, will be held by this court to have been surrendered, unless such surrender has

been expressed in terms too plain to be mistaken." *Jefferson Branch Bank v. Skelly,* 66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1861); *see also Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986) (*"POSSE"*); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982); *Keefe v. Clark,* 322 U.S. 393, 396–97, 64 S.Ct. 1072, 1073–74, 88 L.Ed. 1346 (1944); *Vicksburg, S. & P. R.R. Co. v. Dennis,* 116 U.S. 665, 667–68, 6 S.Ct. 625, 626, 29 L.Ed. 770 (1886).

The Supreme Court has applied the unmistakability requirement most forcefully in cases involving the government's regulatory power, as opposed to the government's power to ease its financial burdens. *See* David Toscano, *Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty,* 92 COLUM.L.REV. 426, 455 (1992). And this case involves the government's regulatory power—the power to supervise thousands of thrifts loaning funds to hundreds of thousands of homeowners and holding billions of dollars in deposits. The unmistakability requirement, the Court has written, "take[s] on added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *POSSE,* 477 U.S. at 52–53, 106 S.Ct. at 2397. None of the very few cases in which the Court has found a contract that waived sovereign power involved Congress' regulatory authority. *See, e.g., Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) (enforcing an agency's promise to provide life insurance policies to individuals who had paid premiums after Congress cancelled the program to "lessen government expenditure").

In the contract documents in this case, we—like the district court—see no unmistakable waiver of Congress' regulatory power. The forbearance language on which Transohio relies is grammatically passive. The Bank Board Resolution, for example, says that "[p]ush-down account-ing *shall be used"* and "[t]he cash contribution by the FSLIC to Transohio ... *may be deemed* a contribution to net worth and *may be booked* a direct credit to Transohio's net worth." The grammatical subjects of the sentences are omitted, and it is far too easy to infer that the sentences refer to the agencies, not to Congress—particularly since Congress was not a party to the contract. At best, the language is ambiguous.

We are reluctant to compensate for the absence of an unmistakable waiver given that, as the documents reflect, the transaction was heavily lawyered and, as Transohio acknowledges, extensively negotiated. The thrift industry is pervasively regulated; as the Federal Circuit recently said in a case involving other regulatory changes required by FIRREA, "[i]t is well known that '[b]anking is one of the longest regulated and most closely supervised of public callings,'" *California Housing Securities, Inc. v. United States,* 959 F.2d 955, 959 (Fed.Cir.1992) (citation omitted). And Congress has repeatedly shown its willingness to change capital requirements. In light of the history of extensive legislative regulation of the savings and loan industry, Transohio, like the thrift in *California Housing,* was "certainly on notice that [it] might be subjected to different regulatory burdens over time." *Id.*

When Transohio and the banking regulators were negotiating the terms of the supervisory mergers, moreover, it was no secret that Congress might alter goodwill accounting rules. By the summer of 1986, both the Senate Banking Committees and House had held hearings on the worsening condition of the savings and loan industry, hearings in which Senators, Representatives, members of the administration and expert witnesses expressed concern about the undercapitalization of many thrifts. *See Hearings on Deposit Insurance Reform and Related Supervisory Issues Before the Senate Committee on Banking, Housing and Urban Affairs,* 99th Cong., 1st Sess. (1985) (*"Senate Hearings"*); *Hearings on the Financial Condition of the Bank and Thrift Industries Before the*

*Subcommittee on Financial Institutions, Supervision, Regulation and Insurance of the House Committee on Banking, Finance and Urban Affairs,* 99th Cong., 1st Sess. (1985) ("*House Hearings*"). Senator Proxmire, for example, told two witnesses from the savings and loan industry of his concern that thrift net worth is "getting worse and worse and worse." *See Senate Hearings* at 234; *see also* 132 CONG.REC. 18032 (1985) (Rep. Gradison expressing concern that the problems of the thrift industry were being underestimated because thrifts were counting goodwill and other intangible assets as capital). Undersecretary of Treasury George D. Gould told the House Banking Committee that "[w]e must set targets and create incentives for the industry to increase its capital." *House Hearings* at 104. And experts criticized the banking regulators' practice of "allowing capital forbearances," explaining that "[f]orbearance has the pernicious effect of encouraging more risk-taking." *House Hearings* at 562, 567 (statement of Andrew S. Carron).

When Transohio negotiated the terms of its supervisory mergers, members of Congress and the executive branch had already referred disdainfully to the regulatory practice of counting goodwill as capital as an "accounting gimmick" or "creative accounting." Speech of Thomas J. Healy, Assistant Treasury Secretary for Domestic Finance (February 19, 1985) (BNA); Rep. Stan Parris, *Low Net Worth and FSLIC*, National Mortgage News at 4 (December 9, 1985). And at least one bill had been introduced in the Senate that would have required FSLIC to "establis[h] ... standards of capital adequacy" for thrifts. Federal Deposit Insurance Protection Act, S. 1304, 99th Cong., 1st Sess. (1985). Explaining the need for that bill, Sen. Metzenbaum advanced a rationale that Congress eventually adopted in forbidding the use of goodwill as capital: "low levels of networth create a powerful incentive for institutions to gamble on high risk investments." 132 CONG.REC. 15930 (1985) (internal quotations and citation omitted). Sen. Metzenbaum also described the need to "in-

creas[e] the capital requirements for federally insured thrifts." *Id.*

Transohio has portrayed itself as victimized by a government that took advantage of the thrift's willingness to help ease the savings and loan crisis. But in light of the long history of pervasive thrift regulation, and in light of the events in Congress before and during the negotiation of the agreement in this case, we share the Eleventh Circuit's view of a similar transaction: the thrift "in effect wager[ed] the chance that the rules would be changed against the potential return if they were not." *Guaranty,* 928 F.2d at 999. We note that, from 1986 until FIRREA's passage in 1989, Transohio was able to count goodwill as capital in accord with its agreement with the banking regulators (this case does not raise any retroactivity questions), and that FIRREA allows Transohio to count goodwill as capital in diminishing amounts until 1993.

Transohio says it sought "to obtain a contractual right against the sovereign that [would be] immune from the effect of future changes in law," but the thrift failed to "make sure that the contract confers such a right in unmistakable terms." *Western Fuels–Utah, Inc. v. Lujan,* 895 F.2d at 789. We see no reason to excuse that failure. Like the Eleventh Circuit, we interpret the contract provisions at issue to mean that the agencies would allow Transohio to treat supervisory goodwill as regulatory capital only as long as the regulatory regime permitted the agencies to do so. *Guaranty,* 928 F.2d at 999. The contract left Congress' regulatory powers intact.

■ *2. The Agencies' Power to Bind Congress.* The district court rightly found that Transohio is unlikely to prevail on the merits for a second reason. Even if the agencies unmistakably promised Transohio that the thrift could count goodwill as capital regardless of any future congressional action, we strongly doubt that such a promise would be binding on Congress. That agency promise would be *ultra vires* and unenforceable.

It is "central to the real meaning of 'the rule of law,' [and] not particularly controversial" that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so. Edward L. Rubin, *Law and Legislation in the Administrative State*, 89 COLUM.L.REV. 369, 402 (1989). Agency actions beyond delegated authority are *"ultra vires,"* and courts must invalidate them. WALTER GELLHORN, CLARK BYSE, ET AL., ADMINISTRATIVE LAW 66 (1987); *see also* 5 U.S.C. § 701, 706(2)(C) (authorizing judicial review of agency actions "in excess of statutory jurisdiction, authority, or limitations"). We assume without expressing a view that Congress might, in a contract, surrender aspects of its regulatory authority—though the Supreme Court has recently said that a *state* may not contract away "essential attribute[s] of its sovereignty," *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977), and long ago suggested that Congress may not either, *see North Am. Commercial Co. v. United States*, 171 U.S. 110, 137, 18 S.Ct. 817, 828, 43 L.Ed. 98 (1898). And we assume without expressing a view that Congress might delegate to an agency the power to contract away Congress' regulatory power—though the Supreme Court has never considered such a congressional delegation.

Even if such a delegation is permissible, however, Congress cannot be found to have delegated to an agency the power to preclude subsequent regulatory legislation unless the delegation was explicit. In the context of contracts entered into by administrative agencies, in other words, the unmistakability doctrine has two components: the contract relinquishes Congress' power to regulate only when (1) the agency, in the contract, has unmistakably waived Congress' regulatory authority, and (2) Congress, in a statute, has unmistakably delegated to the agency the power to surrender Congress' regulatory authority. *See* David Toscano, *supra*, 92 COLUM.L.REV. at 460–64.

The Supreme Court's unmistakability cases require nothing less. *POSSE*, for example, involved a 1951 agreement between the state of California and the Secretary of Health and Human Services under which the parties agreed to extend Social Security coverage to state employees. The agreement permitted the state to terminate the arrangement by providing two-years notice, but Congress later amended the Social Security laws and forbade states from terminating such agreements. The state sued the federal agency, arguing that the original agreement gave rise to a property right that the federal government could not take without just compensation. *See POSSE*, 477 U.S. at 48–53, 106 S.Ct. at 2394–97. The Supreme Court rejected California's claim, finding that Congress had not surrendered its sovereign power to alter Social Security laws.

The Supreme Court reached that conclusion by analyzing the governing statute, the Social Security Act. *See id.* at 53–54, 106 S.Ct. at 2397. The Court found that the statute did not relinquish Congress' power to supersede agreements between states and the HHS and that the HHS, therefore, could not bargain away Congress' authority to change social security rules. *See id.* The Social Security Act contained an express reservation of Congress' power to amend the law, and Transohio tries to limit *POSSE* to those facts. But every Circuit that has considered that proposed limitation on *POSSE* has rejected it. "In light of the fundamental principle that Congress always has the power to amend, repeal or ignore legislation passed by earlier congresses," the Ninth Circuit said, "we decline to ... requir[e] that Congress expressly recite that it reserves the right to 'repeal, amend or alter' legislation to preserve its fundamental right to do so." *Peterson v. United States Dep't of Interior*, 899 F.2d 799, 808 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990); *accord Rhode Island Higher Educ. Assistance Auth. v. Secretary, U.S. Dep't of Educ.*, 929 F.2d 844, 850 (1st Cir.1991); *Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 16 (7th Cir.1990); *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 628–29 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); *Ohio Student*

*Loan Comm'n v. Cavazos,* 900 F.2d 894, 901 (6th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 245, 112 L.Ed.2d 203 (1990); *South Carolina State Educ. Assistance Auth v. Cavazos,* 897 F.2d 1272, 1276 (4th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990).

The "principles form[ing] the backdrop" of the Supreme Court's analysis of the Social Security Act in *POSSE* were those comprising the unmistakability doctrine—the doctrine that " 'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " *Id.,* 477 U.S. at 52, 106 S.Ct. at 2397 (citation omitted). That same doctrine informed the Supreme Court's analysis forty years earlier, in a case involving contracts between bond holders and the Michigan drain district that issued the bonds. The drain districts in *Keefe v. Clark,* 322 U.S. 393, 64 S.Ct. 1072, 88 L.Ed. 1346 (1944), were political subdivisions, creatures of the state and analogous to the agencies here, and in analyzing whether the bond holders had obtained from the district the contractual right they claimed, the Supreme Court analyzed primarily the statute governing the drain district's authority. *See id.* at 396–98, 64 S.Ct. at 1073–74. "We do not find in the provision of the drain statute relied upon by appellants," the Court said, "a clear and unequivocal purpose of Michigan to permit drain districts to bargain away the State's power to sell tax-delinquent lands free of encumbrances." *Id.* at 397, 64 S.Ct. at 1074. Finally, in each of the few cases in which the Supreme Court found a valid contract surrendering Congress' legislative power, the Court made clear that Congress had explicitly authorized the contract. *See, e.g., United States Trust Co.,* 431 U.S. at 17, 97 S.Ct. at 1515 ("the [contractual] obligation was itself created by a statute"); *Perry v. United States,* 294 U.S. 330, 348, 55 S.Ct. 432, 434, 79 L.Ed. 912 (1935) ("The terms of the bond" that a later Congress refused to honor "were definitely prescribed by the [earlier] Congress").

■ An agency, in short, cannot contract away Congress' sovereign power to regulate unless Congress has clearly and unmistakably empowered the agency to do so. The alternative—reading broad congressional delegations of power as including the power to preclude future congressional regulatory legislation—would seriously undermine the constitutional scheme of separation of powers. Transohio rests on the "elementary proposition" that legislatures make policy and agencies make contracts. But Transohio's legal position would allow federal agencies to supplant congressional policymaking by contracting away Congress' power to legislate. " 'The continued existence of a government would be of no great value," as the Supreme Court has said, "if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.' " *Keefe v. Clark,* 322 U.S. at 397, 64 S.Ct. at 1074 (citation omitted).

Transohio asserts that it does not seek to interfere with Congress' power to regulate; it merely seeks an exception for itself and other thrifts in its position. But we cannot ignore the ominous but necessary implications of Transohio's legal argument. If FSLIC and the Bank Board could promise Transohio that the thrift would be immune from future congressional changes of capital requirements, it could make that promise to *every* thrift, by contracting with them one at a time, preempting congressional regulation of all but newly chartered thrifts, and constraining the government's ability to respond to serious economic problems. The result would be agency lawmaking of an unprecedented—and plainly unconstitutional—kind. Under Transohio's approach, agencies would be making laws not pursuant to congressional direction, but over Congress' objections. The framers, however, "fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to 'clean out the rascals' than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts." *United States Trust Co.,* 431 U.S. at 45, 97 S.Ct. at 1529 (Brennan, J., dissenting).

Even if the equities were on Transohio's side, finally, the Supreme Court has made

clear that such considerations cannot defeat the constitutional ordering. In *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), involving a welder who relied on erroneous advice from an executive agency official, the Court held that common-law principles of equitable estoppel cannot be used to compel the expenditure of public money not authorized by Congress. The Court in *Richmond* indicated its support for the view that enforcing unauthorized statements by executive agency officials, whether or not enforcement would result in the payment of public funds, would invade the province constitutionally reserved to Congress. *See id.,* 110 S.Ct. at 2469–71.

As Justice Frankfurter said on behalf of the Court, "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority," and "[t]his is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). A person, real or corporate, who wants to secure from an agency a right against future congressionally mandated regulatory changes must make sure that the agency has the power to grant that right. Where the forbearance from regulation is significant, and especially where lawyers handle the transaction, it hardly seems unreasonable to require the party to do so—even were it not constitutionally required.

We do not decide today, we should make clear, that an agency can never bind Congress without an explicit statutory delegation to do so. Contracts between agencies and private parties contain terms that, broadly speaking, fall into one of two categories: terms that could appear only in contracts with the government, such as a waiver from future regulation; and terms that resemble those in contracts between private parties, such as the price term in a lease of land. An example from the second category appears in *Western Fuels–Utah;* Congress authorized the Secretary of the Interior to lease federal lands for coal mining, and said that the Secretary could read-

just the "terms and conditions" of the lease after 20 years. *See* 895 F.2d at 782. That statutory delegation may, without any more explicit language, authorize the Secretary to set a cents-per-ton royalty figure for the coal mining company, and to prevent Congress from changing the royalty amount during the 20–year period covered by the lease. Or it may not. The court in *Western Fuels–Utah* did not address that issue, and neither do we. Whatever the agency's authority to bind Congress to a term that might appear in a private contract, however, our holding today means that an agency cannot immunize a party against Congress' regulatory power unless Congress has unmistakably delegated to the agency the authority to do so. In terms of *Western Fuels–Utah,* a standard delegation to lease coal-mining land, while it might authorize an agency to lock-in a royalty amount, would not authorize the agency to bargain away Congress' regulatory power to, say, set mine-safety standards.

Here, Transohio reads its contract with the banking regulators as waiving Congress' regulatory power, the power, in effect, to set thrift-safety standards. And unless Congress has unmistakably delegated to FSLIC and the Bank Board the authority to waive that power, any promise by the agencies to do so would be *ultra vires* and unenforceable. We see nothing in either of the agencies' enabling statutes, nor in any other statute, that amounts to an unmistakable delegation. Congress gave FSLIC the power to "make contracts," 12 U.S.C. § 1725(c)(3) (repealed 1989), but not explicitly to make contracts that would preclude future congressional regulation. Congress also granted FSLIC the power to deal with insolvent thrifts "as it deems appropriate," 12 U.S.C. § 1725(c)(3) (repealed 1989), but not expressly to bind Congress where FSLIC deemed it appropriate. We see nothing in the Bank Board's governing law that could be read as an unmistakable delegation of the power to surrender Congress' regulatory authority. Indeed, the Bank Board statute, like the law in *POSSE,* contains an express reservation of "[t]he right to alter, amend or repeal this chapter." Federal

Home Loan Bank Act, Pub.L. No. 72–304, § 30, 47 Stat. 741 (1932) (codified at 12 U.S.C. § 1449) (repealed 1989).

We find, in sum, that FSLIC and the Bank Board *did* not, and *could* not, enter into a contract with Transohio that barred Congress from regulating. Because Transohio did not receive from the agencies a property right that prevented Congress from altering capital accounting rules, Transohio cannot prevail on its constitutional claims. Accordingly, the district court did not err in concluding that Transohio was unlikely to prevail on the merits of its constitutional claims. The district court did not abuse its discretion in weighing the factors and concluding that Transohio was not entitled to a preliminary injunction.

## IV. CONCLUSION

We find that the district court properly exercised jurisdiction over Transohio's statutory and due process claims. We remand Transohio's common-law contract claim, however, with instructions to dismiss for lack of jurisdiction. On the merits, we affirm the district court's denial of Transohio's preliminary injunction motion.