ERVIN AND ASSOCIATES,
INC., et al., Plaintiffs,

v.

Helen DUNLAP, et al., Defendants.

No. CIV. A. 96–1253(WBB).

United States District Court,
District of Columbia.

Feb. 14, 1997.

defendants denied them contracting opportunities in retaliation for their exposure of alleged fraud and corruption in HUD's procurement of contracts, in violation of the First and Fifth Amendments to the Constitution; the Administrative Procedure Act (APA), 5 U.S.C. § 702, *et seq.;* and the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The government filed a motion to dismiss for lack of jurisdiction; for failure to state a claim for relief under the First Amendment, the Fifth Amendment, the APA, or FOIA; and for lack of standing to bring a Fifth Amendment equal protection claim.

The parties' arguments are thoroughly briefed, and oral argument was had upon the motion. Upon consideration of the arguments of the parties and the entire record of this case, this Court concludes that it has jurisdiction to hear Ervin's claims, and that he [1] has stated claims for which relief may be granted under the First and Fifth Amendments, the APA, and FOIA.

### FACTS OF THE CASE

Ervin's claims arise out of HUD's implementation, under Helen Dunlap's leadership, of an initiative to privatize a large portion of its housing stock. Ervin alleges that the initiative is corrupted from its inception by favoritism and illegal contracting practices, and that he has been blackballed by the agency as a result of having publicly expressed this fact and exposing this alleged corruption.

Ervin has been a contractor for HUD since 1989. In each of the years 1994 and 1995, he performed approximately $7 million of work on HUD contracts. He relies for his income exclusively on his work for HUD. Ervin alleges that one indication of HUD's previous satisfaction with his work is the fact that the agency always exercised options to renew his contracts when such options were available. Second Amended Complaint (Complaint) at 9.

Wayne Gormly Travell, Tucker, Flyer & Lewis, Washington, DC, for Plaintiffs.

G. Scott Williams, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

BRYANT, Senior District Judge.

Ervin and Associates, Inc. and EAA Capital Company, L.L.C. ("Ervin") allege that the

---

1. The Court will refer, in the rest of this Memorandum, to both plaintiffs as "Ervin," using masculine, singular pronouns.

Despite his dependence on HUD for his livelihood, Ervin allegedly became critical of the agency around mid–1994, when he raised questions about its privatization initiative and the procurement of a financial advisor for the initiative. HUD announced its decision in September 1993 to privatize its multifamily housing mortgage holdings through a "note sales initiative." Helen Dunlap, who was appointed Deputy Assistant Secretary for Multifamily Housing at HUD in June 1993, was in charge of the note sales initiative, and supervised the procurement of a financial advisor to assist HUD in the initiative. Hamilton Securities (Hamilton), a private investment firm, won the Financial Advisory Services contract. Ervin alleges that Dunlap fraudulently intervened in the contracting decision to insure that Hamilton got the contract. Ervin further alleges that after a number of complaints about the propriety of the procurement and conditions of the Financial Advisory Services contract were raised both within and outside of HUD, including Ervin's complaints, HUD was forced to re-procure a new financial advisor. Ervin also alleges that his complaints are at least partly responsible for Dunlap's move in November 1995 to the position of Deputy Assistant Secretary of the Office of Housing Operations. Even after her change of position, however, she continued to exercise authority over the note sales initiative. She left the agency in October 1996.

Ervin alleges that after mid–1994, he continued to criticize allegedly fraudulent and corrupt practices at HUD by raising critical questions during public meetings, resisting efforts to involve him in allegedly illegal contracting practices, and filing administrative appeals of procurement decisions. His criticism increased in the second half of 1995, and was focused on the allegedly corrupt administration of programs by Dunlap and others.

Ervin's claim is that in mid–1994, he began to lose contract bids, sometimes as a result of Dunlap's interference to direct work toward her favored contractors, and other times as a result of retaliation for his exposure of favoritism and procurement fraud in which Dunlap and others within HUD participated. Since mid–1994, Ervin has not won a single competitive procurement for which he bid. He alleges that he is on the brink of going out of business because he cannot succeed in winning any new contracts with HUD, and his existing contracts have either been terminated, or HUD is arbitrarily refusing to perform on them; on at least one occasion he was improperly denied the opportunity to bid on a major contract.

Specifically, Ervin alleges that Dunlap interfered to insure the awards of the following contracts to her favored contractors:

— the first and second Financial Advisory Services contracts, awarded in September 1993 and January 1996, respectively, and the "Cross–Cutting Task Order" establishing who would oversee the other financial advisors, awarded in April 1996 to Hamilton;

— the Due Diligence contract awarded in May 1994 to Williams, Adley, and Associates (Williams), which included a subcontract for Hamilton;

— the Special Workout Assistance Teams (SWAT) contracts, awarded to the Kerry Company (Kerry) in December 1994 and December 1996.[2]

Ervin alleges that he was denied a fair opportunity to bid successfully on the following contracts, in retaliation for his complaints about favoritism and fraud:

— the second Due Diligence contract, awarded in August 1995;

— the Technical Assistance Public Housing contract, awarded September 25, 1995;

— the Legal Services contract, awarded on November 29, 1995;

— the Chicago Public Housing Authority contract, awarded in January 1996;

---

2. In his Complaint, Ervin described conversations with a member of the Technical Evaluation Panel for the third SWAT contract that led him to believe Dunlap had interfered to guarantee that Kerry would win it. As Ervin predicted, the contract was actually awarded to Kerry in December 1996. The parties came before the Court on December 18, 1996 for a hearing on Ervin's motion to enjoin Kerry's performance of the SWAT contract.

— the second Financial Advisory Services contract, awarded January 26, 1996;

— the Management Studies contract, awarded in May 1996; and

— the third SWAT contract, awarded in December 1996.[3]

In addition, Ervin alleges the following retaliatory acts with respect to contracts that he had previously been awarded:

— dissemination to another contractor, in September 1995, of Ervin's proprietary information related to HUD's multifamily portfolio, eliminating Ervin's competitive advantage in this area;

— reduction in the amount of work to be performed under Ervin's Asset Management contract in October 1995, followed by reversal, in August 1996, of its earlier decision to exercise its option to renew the contract, and announcement of a new procurement for the same services that Ervin had performed under this contract for the previous six years;

— in December 1995, reversal of its earlier decision to renew the Seattle Delegated Processing contract;

— in April 1996, issuance of an order to not use Ervin's services for performance of physical inspections, pursuant to his Physical Inspection contract, for which he had just received a notice of extension on April 1, 1996;

— with respect to Ervin's Audited Financial Statements contract, refusal to provide computer software necessary for Ervin's performance, refusal to issue task orders for Ervin to perform under the contract, and reprocurement of the same services from other contractors;

— refusal to pay Ervin $2.6 million owed for work performed under the Audited Financial Statements, Asset Management, and Seattle Delegated Processing contracts.

Ervin attributes his loss of contracts to retaliation for his criticism of Dunlap and HUD, based upon his unexplained and complete inability to win and even bid on contracts that he reasonably expected to win, in stark contrast to his prior success; and on anonymous taped voice mail messages purportedly from people within HUD, statements made by named individuals within HUD, and written communications from anonymous HUD sources, all of whom support his allegation that he is the subject of a scheme to put him out of business.

In addition to his claims of retaliation and favoritism in the awarding of contracts, Ervin has a FOIA claim. He submitted approximately sixty FOIA requests and has allegedly received complete responses to no more than ten. The government insists that it is diligently processing his requests, but the agency is overwhelmed by the volume of documents he seeks and is unable to proceed any faster, or give any indication of which documents will be produced or withheld.

## MOTION TO DISMISS

### I. Failure to State a Claim Under the First Amendment

The government moves for dismissal of Count I on the grounds that Ervin falls short of drawing the requisite link between HUD's allegedly retaliatory actions and Ervin's critical speech. The government says that Ervin's complaint is insufficient in that it (1) fails to allege an awareness by HUD officials of Ervin's speech critical of the agency, (2) fails to allege a sufficient nexus, in time or substance, between Ervin's speech and HUD's allegedly retaliatory acts, and (3) fails to credibly allege retaliatory intent.

 The government's arguments not only misstate Ervin's allegations, but demand that he meet a pleading standard that is higher than required at the motion to dismiss stage of litigation. Pursuant to *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), a contractor can prevail on a First Amendment claim against the government if he can show that

3. *See* note 2, above.

the termination of his "preexisting commercial relationship," *Umbehr*, 116 S.Ct. at 2352, "was motivated by his speech on a matter of public concern." *Id.* A contractor must make "an initial showing that requires him to prove more than the mere fact that he criticized the [government decision-makers] before they terminated him." *Umbehr*, 116 S.Ct. at 2352. Once this initial showing is made, the government has an opportunity to show, "beyond a preponderance of the evidence, that in light of their knowledge, perceptions and policies at the time of the termination, the [decision-makers] would have terminated the [relationship] regardless of [the contractor's] speech." *Id.* Government authorities have discretion in awarding contracts, and can justify contracting decisions for a number of reasons, or for no reason. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 2361, 135 L.Ed.2d 874 (1996). *Umbehr* and *O'Hare* make it clear, however, that the basis of a decision cannot be retaliation in violation of the First Amendment.

Ervin's preexisting relationship with HUD is sufficient to place him within *Umbehr*'s ambit, which includes those who have "a preexisting commercial relationship with the government," but excludes those "bidders or applicants for new government contracts who cannot rely on such a relationship." *Umbehr* at 2352. Ervin had a relationship with HUD that began in 1989 and, to the extent that he is still performing on any previously awarded contracts, continues today. He alleges that he expected to continue successfully bidding for and performing on contracts for HUD in the future, based on his past relationship and success with the agency. HUD routinely exercised options to renew contracts with Ervin when such options were available, and Ervin performed contracts worth approximately $7 million in each of the years 1994 and 1995. His business consisted entirely of performing work for HUD, and he had a reasonable expectation, based on his preexisting relationship with the agency, that his work for HUD would continue to sustain him.

■ Ervin's complaint also satisfies the requirement that the alleged retaliation be responsive to speech critical of the agency regarding matters of public concern—not just complaints regarding Ervin's own loss of contracts. He alleges that he began criticizing the agency because of concerns he had with its plan to privatize a large portion of its housing stock, and that he became increasingly critical regarding his belief that HUD officials were engaged in fraudulent and corrupt procurement practices. His criticism may have, in some instances, involved contracting decisions in which he had a personal stake, but he also was critical regarding decisions in which he had no personal stake. The decisions he criticized involved corrupt practices that are ultimately harmful not just to contractors, but the general public.

With respect to his burden to draw a connection between his speech and the government's action, the government describes Ervin's burden as pleading facts "from which a retaliatory intent on the part of the defendants may reasonably be inferred," Govt. Mem. in Supp. of Mot. to Dismiss (Govt.Mem.) at 42, *citing Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 42 (1st Cir.1992), in contrast to facts from which one can only infer that the termination was simply an exercise of discretion, or a decision based on permissible factors, *see, e.g., Nestor Colon, supra; Gagliardi v. Village of Pawling*, 18 F.3d 188 (2nd Cir.1994). The government argues that Ervin falls far short of meeting this standard, as his complaint does not even "allege that the defendant was aware of the protected communication which allegedly prompted the unlawful retaliation." Govt. Mem. at 43. As support for this argument that Ervin has failed to meet even a minimal pleading standard, the government attacks the basis of Ervin's conclusions and the credibility of his allegations.

■ To the extent that the government's argument is that Ervin's allegations are not credible or do not prove the allegations of retaliatory intent, the government misstates Ervin's burden of pleading as compared to his burden of proof. At the motion to dismiss stage of litigation, the Court must treat Ervin's factual allegations as true. Based upon this assumption, Ervin has clearly met his burden of pleading facts to support his allegation that the termination of his preex-

isting relationship with HUD was motivated by his speech on matters of public concern.

Ervin alleges that he made his criticism known both publicly and within the agency by speaking out at public meetings, filing agency protests, filing GAO protests, through direct communication with HUD officials, and by filing federal lawsuits. Ervin became increasingly critical of HUD and Helen Dunlap starting in mid–1994 and culminating in the filing of lawsuits in this Court, the United States District Court for the District of Colorado, and the United States Court of Claims. At the same time, he gradually lost all of his work for the agency, through termination and reprocurement of existing contracts, decisions not to exercise options to continue work under existing contracts, and failure by HUD to perform on existing contracts. Ervin alleges that he faces the prospect of going out of business because he does not have any work to sustain his corporation.

The government contends that Ervin merely lists a sequence of events, with no linkage between HUD's allegedly retaliatory contracting decisions and Ervin's allegedly protected speech. To the contrary, the chronology of events alleged demonstrates a gradual, but complete and unexplained termination of Ervin's relationship with HUD. Ervin provides ample support for his conclusion that the termination of his contracting relationship with the agency was deliberate, and in retaliation for his criticism of procurement and contracting decisions.

In addition to the sequence of events and the dramatic change in the nature of his relationship with HUD, Ervin alleges that he received a number of phone messages from anonymous callers, purportedly from within HUD, who corroborate his belief that he is deliberately excluded from continuing to work for HUD because he was critical of certain officials and decisions within the agency. Furthermore, a high-level HUD official, involved in evaluating contracts and making award recommendations, allegedly told Ervin outright that he "has been blackballed." Complaint at 29. His allegations

are sufficient to meet his burden of showing more than criticism, followed in time by termination of his contracts, and are supported by more than his own interpretation of events.

Ervin's allegations include all of the elements necessary to state a claim of retaliation in violation of the First Amendment. Thus, the government's motion to dismiss Count I for failure to state a claim under the First Amendment will be denied.

## II. Failure to State a Claim Under the Fifth Amendment for Violation of Due Process

Counts II and VI of Ervin's complaint allege violations of his Fifth Amendment due process rights. Count II alleges that the defendants' fraudulent and corrupt contracting practices deprived Ervin of contracts in which he had a protectable property interest, and Count VI alleges that the defendants' blackballing of Ervin has harmed his reputation and good name such that he can no longer win any HUD contracts, in violation of his liberty interest.

The government moves to dismiss both counts for failure to state a claim.

### A. Deprivation of Property Interest

In Count II of his complaint, Ervin makes out a claim for violation of his procedural due process rights. He alleges that HUD's practice of engaging in favoritism in contracting and other decisions violates his due process right to be free of contracting decisions that are based upon "bias, bad faith, improper motive, lack of uniformity, and lack of impartiality." Complaint at 48-9. His claim is procedural, rather than substantive, for "unless a fundamental liberty protected elsewhere in the Constitution (e.g. free speech) is at stake, the primary concern of the due process clause is procedure, not the substantive merits of a decision." *Newman v. Burgin*, 930 F.2d 955, 961-2 (1st Cir. 1991).[4] Ervin does not claim a constitution-

---

4. Although Ervin claims, in Count I, deprivation of his First Amendment free speech rights, the Supreme Court has made it clear that "the First

Amendment does not create property rights or tenure rights..." *Umbehr*, at 2347. In this Count, Ervin focuses on the loss of contracting

ally protected interest in winning certain contract awards, but a protected interest in participating in a procurement process that meets certain standards of fairness.

■ In order to proceed with this due process claim, Ervin must have a property interest in his contracts with HUD, and he must allege that HUD's unfair procurement process deprived him of that property interest. It is well-established that property interests can reside in contracts with the government. *See, Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In order to establish that one has a property interest in a contract, a plaintiff must "have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Such a claim of entitlement depends upon "rules or mutually explicit understandings that support [a contractor's] claim of entitlement to the benefit." *Perry,* 408 U.S. at 601, 92 S.Ct. 2694.

Ervin alleges that he has a legitimate claim of entitlement, with which Dunlap allegedly interfered, in the following contracts: the second Financial Advisory Services contract, awarded in January 1996; the first Due Diligence contract, awarded at the end of 1994; and the third SWAT contract, awarded in December 1996, and the Single Family Asset Management contract, awarded in May 1996. Ervin also has a legitimate claim of entitlement to his existing Asset Management contract.

■ With respect to the Due Diligence and SWAT contracts, Ervin's allegations describe an interest that qualifies as a "property interest" under the standard set out in *Perry,* 408 U.S. at 601–2, 92 S.Ct. 2694. He alleges that both contracts would have been awarded to him, but for distortion of the procurement process. Ervin alleges that sources inside HUD told him that he was recommended to win and would have won the SWAT contract, but for Dunlap's interference. During the hearing on Ervin's motion

opportunities, independent of his free speech

to stay execution of the SWAT contract by Kerry, the government conceded that if Dunlap had interfered in the SWAT procurement as Ervin alleged, her actions would be in violation of contracting and procurement regulations. *See* Transcript (December 18, 1997 Hearing) at 7. Similarly, Ervin alleges that he was notified that he won the Due Diligence contract, but was then told that Dunlap had intervened to direct the contract toward another contractor. If Dunlap interfered to remove the Due Diligence contract from Ervin, once a decision had been made to award it to him, and to award it instead to her favored contractor, as Ervin alleges, her actions would amount to depriving Ervin of contracts that the rules governing procurement and administration of contracts would say he was entitled to have.

■ Ervin also has a property interest in his existing Asset Management contract. He alleges that HUD has terminated his performance of the contract, yet reprocured exactly the same services under a new contract, in order to deprive him of his contract. If Ervin's allegations are true, the government has deprived him of his contract without providing any reason or opportunity for him to try to keep the contract or compete fairly for the new contract, in violation of the rules governing contract procurement and his due process rights.

■ However, with respect to the Financial Advisory Services and Single Family Asset Management contracts, Ervin does not allege any interest that meets the definition of a "property interest." He argues only that he expected to have a fair chance of winning the Financial Advisory Services contract, and makes no argument with respect to the Single Family Asset Management contract. Mem. in Opposition to Mot. to Dismiss (Opposition) at 26. Although the rules governing procurement support Ervin's "expectation" of a fair process, Ervin does not allege that he had already acquired an interest in or entitlement to the contracts that was injured by HUD's unfair process. His interest, at the time that the allegedly arbitrary actions took place, was no different

rights.

than any other contractor's expectation or interest in winning the contracts. Thus, with respect to the Financial Advisory Services and Single Family Asset Management contracts, Ervin cannot make out due process claims.

The government's motion to dismiss Ervin's due process claims regarding the Financial Advisory Services and Single Family Asset Management contracts will be granted, but the motion to dismiss with respect to the Due Diligence, SWAT, and Asset Management contracts will be denied.

## B. Deprivation of Liberty Interest

In Count VI of his complaint, Ervin alleges that officials at HUD have extinguished all opportunities he has to contract with the agency by spreading false and disparaging statements about him, and by blackballing him. He claims that this violates the Fifth Amendment's guarantee of due process by depriving him of his liberty interest in competing, on the basis of his own good reputation, for future contracts with HUD. The government says that Count VI must be dismissed because Ervin has not alleged any facts to support his claim that he has been subjected to the imposition of a stigma that forecloses opportunities to compete for other contracts.

 In order to make out a claim that disparaging, defamatory, or stigmatizing statements that harm one's reputation and ability to compete for contracts rise to the level of a constitutional deprivation, a plaintiff must allege that the injurious statements have actually affected some change in status under law, such that a right or privilege once available is no longer available. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). "[A] government action that potentially constrains future employment opportunities" with one government agency can be considered a deprivation of liberty, but the action "must involve a tangible change in status," *Kartseva v. Department of State*, 37 F.3d 1524, 1527 (D.C.Cir. 1994), as compared to a more general injury to reputation and the consequent general dampening effect on employment opportunities that is actionable as common law defa-

mation, *see Vander Zee v. Reno*, 73 F.3d 1365, 1396–70 (1996). The change in status does not have to be the result of an "official" action, but must have the effect of debarring one from future employment or contracting, in order to implicate a liberty interest. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 964–6 (D.C.Cir.1980); *see also Kartseva*, 37 F.3d, at 1528. In addition, the allegedly damaging government action must actually impose a stigma or damage one's reputation. In *Roth*, 408 U.S. 564, 92 S.Ct. 2701, the Supreme Court rejected Roth's liberty interest claim when the government gave no reason for its decision not to rehire Roth. The government, "in declining to rehire the respondent, did not make any charges against him that might seriously damage his standing and associations within the community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality," *Roth*, 408 U.S. at 573, 92 S.Ct. 2701. The Supreme Court contrasted this situation with one in which one's "good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Roth*, 408 U.S. at 573, 92 S.Ct. 2701; *see also, Mazaleski v. Treusdell*, 562 F.2d 701, 714–5 (D.C.Cir.1977).

 Ervin's allegations are sufficient to state a claim for infringement of his liberty interest. He says that officials within HUD made disparaging and defamatory statements that effectively barred him from future contracts with the agency. Prior to the events that form the substance of this Complaint, Ervin allegedly enjoyed a good reputation at HUD. That good reputation has allegedly been tarnished and devalued because Dunlap and other officials within HUD "have spread rumor and innuendo throughout HUD in order to prevent Ervin from winning new contracts ... result[ing] in a constructive debarment." Complaint at 59–60. Ervin reports one official in HUD telling him that "he has been blackballed," Complaint at 29; another official reported to Ervin that HUD would not exercise the option on an existing contract because of "all the issues going on with John [Ervin] and HUD." Complaint at 37. These statements demon-

strate that there has been, at the least, an unofficial determination that Ervin should not get any more contracts from HUD. The basis for making that determination is unknown. It may be, as the government contends, that the effective debarment reflects more poorly on officials within HUD than on Ervin. However, Ervin alleges that the basis for the effective debarment is false and disparaging statements and innuendo about Ervin. At this stage of the proceedings, Ervin's allegations will be taken as true and the government's motion to dismiss Count VI for failure to state a claim will be denied.

## III. Lack of Subject Matter Jurisdiction

The government moves to dismiss Counts I and II of Ervin's Complaint on the grounds that the Court is unable to grant any of the relief Ervin requests and the Court, therefore, lacks subject matter jurisdiction over the claims. The government's primary contentions are that: (1) the contract-specific relief that Ervin seeks is available only upon adjudication of contract disputes in the Claims Court, and (2) this Court cannot grant relief in the nature of a declaration that specified contracts are void *ab initio*. The government also raises questions of standing and mootness.

### A. Claims Court Jurisdiction

The government contends that Ervin's claims belong in the Claims Court, which has jurisdiction over "any claims against the United States founded... upon any express or implied contract." 28 U.S.C. § 1491(a)(1) (Tucker Act). Although Ervin alleges constitutional and statutory violations, the constitutional and statutory violations arise out of and affect Ervin's relationship with the government as a contractor, and the relief he requests implicates specific contracts. The government argues that the contract-specific nature of the relief requested precludes this Court from exercising jurisdiction over Ervin's claims.

The government's argument incorrectly makes the nature of the *relief requested* determinative of this Court's jurisdiction, when the appropriate inquiry focuses upon the nature of the *claim presented*, of which the requested relief is but one aspect. The Tucker Act gives the Claims Court jurisdiction over contract claims for monetary damages against the federal government, 28 U.S.C. § 1491(a)(1), while the APA gives the federal district courts jurisdiction over constitutional and statutory claims for nonmonetary damages against the federal government for which there is no other adequate remedy at law, and for which no other statute has explicitly or impliedly forbidden relief. 5 U.S.C. §§ 702, 704; *see Transohio Savings Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 607–13 (D.C.Cir.1992).

■ The determination of whether a claim belongs in the Claims Court or in the federal district court therefore depends upon whether the claim is "at its essence a contract action," or a constitutional or statutory claim, a determination that "depends upon both the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C.Cir. 1982). To determine how a claim is classified, courts look at the source of the rights that are allegedly injured, the allegedly injurious action, the remedy requested, and the unique expertise of the Claims Court, as compared to a federal district court. *A & S Council Oil Co. v. Lader,* 56 F.3d 234, 241 (D.C.Cir.1995); *Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 78–9 (D.C.Cir.1985); *Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 894 (D.C.Cir.1985).

■ Contrary to the government's arguments, Ervin's claim that HUD has refused to pay him for performance on existing contracts, that HUD has refused to provide him with computer software necessary for performance of the Audited Financial Services contract, and that HUD is refusing to issue a task order for his performance under the same contract, are allegations of retaliation in violation of Ervin's constitutional rights. The allegations are that the government is taking retaliatory action to drive Ervin out of business by failing to pay him and obstructing his performance of his Audited Financial Services contract. In deciding these claims, the Court may have to determine the terms of the contracts, but the contract determina-

tions are merely premises for the ultimate determination of whether HUD is retaliating against Ervin in violation of the First Amendment. Furthermore, Ervin does not seek monetary damages for "breach of contract," but an injunction against unconstitutional obstruction of Ervin's ability to continue to do business. Although the requested injunction may have the same effect as specific performance of a contract,

> so long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, its remedies are also not contract-related, and the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate.

*Megapulse,* 672 F.2d at 971. The D.C. Circuit Court of Appeals reaffirmed this decision by interpreting its prior decision in *Sharp v. Weinberger,* 798 F.2d 1521 (D.C.Cir.1986), to hold that a "litigant may bring statutory and constitutional claims in federal district court even when the claims depend upon the existence and terms of a contract... [and] where the relief sought is an order forcing the government to obey the terms of the contract," *Transohio,* 967 F.2d at 610.

Likewise, Ervin's request that the Court enjoin HUD's procurement of contractors to perform work that Ervin has already contracted to perform, and his related request that HUD be required to follow through on decisions to exercise options to renew contracts with Ervin rather than replace Ervin with other contractors, are properly resolved in this Court. His claims are less "breach of contract" claims, as the government argues, than they are claims that the government is

using its contracting powers as a means to retaliate against Ervin. Regardless of the terms of the individual procurement decisions being challenged, Ervin seeks an order prohibiting the government from retaliating against him by terminating its relationship with him as a contractor. He strives to continue an ongoing relationship with the government for which a one-time monetary award on a contract claim would be an inadequate substitute. *See Transohio,* 967 F.2d at 608, *citing Bowen v. Massachusetts,* 487 U.S. 879, 904, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). This Court has jurisdiction to award the relief Ervin requests.[5]

## B. Unavailability of Relief in the Form of a Declaration that Contracts are Void *Ab Initio*

### 1. Inability of the Court to grant the requested relief

 The government also argues that Ervin's requests, in Counts I, II and VIII, for declarations that contract awards made in violation of Ervin's First and Fifth Amendment rights are void *ab initio* are requests for relief that is unavailable in any court; therefore, the claims underlying these request for relief must be dismissed. The contract awards that Ervin seeks to void are: the second Financial Advisor Services contract, both Due Diligence contracts, the second and third SWAT contracts, and the Single Family Asset Management contract.[6] The government argues that the appropriate relief to cure the violations Ervin alleges is an injunction requiring the agency to redo the bidding process in a manner that is legal. Govt. Mem. at 27, *citing O'Donnell Construction Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C.Cir.1992) and *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 206–7 (D.C.Cir.1984).

In contradiction of the government's characterization of the relief Ervin seeks as un-

---

5. The government also moved for dismissal of Ervin's challenge to the third SWAT procurement for lack of jurisdiction, arguing that this Court cannot hear "pre-award" contract claims. The third SWAT contract was awarded in December 1996, so the claim challenging its procurement can no longer be called a "pre-award" claim.

6. Although Ervin's due process claims for relief with respect to the Single Family Asset Management and second Financial Advisory Services contracts will be dismissed, his First Amendment claims survive.

available, Ervin asks for exactly the relief that the government argues is appropriate. Ervin asks that the Court declare the contracts void *ab initio,* meaning "from the beginning; from the instant of the act; at the outset." Webster's Dictionary 3 (3d Ed.1961). The practical effect of such a declaration is that HUD will have to reprocure the services covered by the contracts, a remedy that the government concedes is appropriate. The Court will not dismiss Counts I, II, and VIII on the grounds that the relief Ervin requests is unavailable.

### 2. Joinder of indispensable parties

 The government also argues that the Court cannot grant Ervin the relief he requests unless he joins as indispensable parties to this action those contractors who were awarded contracts that Ervin now seeks to have declared void. *See Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 788 (D.C.Cir. 1983). Fed.R.Civ.P. 19(a)(2) requires joinder of persons who

> claim[ ] an interest relating to the subject of the action and [are] so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Those contractors who stand to be deprived of contracts if Ervin prevails in his lawsuit are arguably within this definition. However, the contract recipients have no part in resolving the constitutional and statutory dispute about the government's treatment of Ervin, and their joinder now would not relieve the government of any risk of incurring multiple obligations. Nor does the failure to join them now create any impediment to their potential later recovery in separate lawsuits.

Furthermore, even if the Court determined that it is necessary to join the contract recipients as indispensable parties, their nonjoinder would not be grounds for dismissal of Ervin's claims. The Court would allow Ervin to amend his Complaint to include the necessary parties.

### 3. Mootness of claims for relief as to contracts that are completed or substantially completed

 The government argues that it is impossible to grant Ervin's requests for injunctive relief with respect to contracts that have already been completed, making the claims moot. The determination of whether contracts are fully performed and the related determination of whether injunctive relief is appropriate are factual determinations. *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 (D.C.Cir.1982). Even if the facts show that injunctive relief is inappropriate, Ervin may seek recovery for costs incurred in preparing bids for the contracts. *Id.; see also Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 207 (D.C.Cir.1984). Therefore, Ervin's claims will not be dismissed as moot.

Nor will Ervin's claims be dismissed for inability to grant the requested relief where the contracts have been substantially performed. Raising the same arguments raised in its motion to dismiss claims as moot, the government argues that Ervin is unable to challenge contracts that are substantially performed because it will be impracticable for the Court to award the requested relief. As explained above, it is not impossible for this Court to award some relief despite the fact that contracts have been substantially performed. Ervin's claims will not be rejected, even if contracts are substantially completed.

### C. Lack of Specificity

 The government argues that Ervin's claims for relief are too vague in that he requests, generally, that the Court enjoin further illegal acts. Ervin's request for an injunction against further illegal acts is not made in isolation, however, but in combination with a description of the allegedly unconstitutional conduct to which he has been subjected, the contracts that have been affected by such conduct, and the type of relief that he seeks with respect to each contract. His claim for relief will not be dismissed for lack of specificity.

## IV. Failure to State a Claim under FOIA

Count III of Ervin's complaint states a claim for declaratory and injunctive relief under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The government moves to dismiss this count on two grounds: (1) Ervin's complaint is too vague; and (2) Ervin has not, and does not allege that he has exhausted his administrative remedies.[7]

### A. Insufficiently Vague Pleadings

■■ The parties agree that this Court has jurisdiction over a FOIA claim if a plaintiff alleges that an agency has improperly withheld agency records. Govt.'s Mem at 56; Opposition at 28. The government argues that Ervin's complaint is too vague to meet this standard, however, because he does not specifically identify each piece of information requested, HUD's response (if any), and the reason that HUD's response is improper.

Ervin alleges that he has made over sixty FOIA requests, and HUD has responded fully to less than ten of them. He describes the general nature of his requests and alleges that HUD's partial responses to some of his fifty "unanswered" requests are "untimely, non-responsive, evasive, incomplete, or otherwise not in accordance with the law." Complaint at 51. He also alleges that HUD has not made any response to some requests. Complaint at 51. Given the fact that the initial FOIA requests were made to the HUD, putting the agency on notice of what information Ervin sought, and the fact that the agency is in the best position to know what information it is withholding, Ervin's allegations are sufficient to state a claim under FOIA.

### B. Failure to Allege Exhaustion of Administrative Remedies

■■ The government also argues that Ervin has failed to allege exhaustion of administrative remedies, which is an essential element of FOIA claim. Although FOIA requires that a requester exhaust administrative remedies before proceeding to district court, the FOIA statute deems administrative remedies to be exhausted when ten days have passed without any response from an agency. 5 U.S.C. § 552(a)(6)(C). Even when a requestor does not proceed to district court immediately following the ten day "non-response" period, administrative remedies are deemed to be exhausted so long as the requester files suit prior to any response by the agency. *Oglesby v. United States Dept. of the Army*, 920 F.2d 57, 61 (D.C.Cir. 1990). If the agency responds prior to the requester's filing of suit, but the response does not sufficiently inform the requester that the agency has made a determination with respect to the request that can be appealed to the head of the agency, the requester is also deemed to have exhausted administrative remedies. *Id.*, at 67.

Ervin alleges that the agency has never responded to some of his requests for information. To the extent that the agency has made no response, Ervin is automatically deemed to have exhausted administrative remedies. Ervin also alleges that the agency has partially responded to at least some of his requests, and that the partial responses further the government's attempts to keep from Ervin information that he has a right to see, in retaliation for his exposure of wrongdoing at the agency. It is possible that these incomplete responses do not sufficiently describe Ervin's right to proceed administratively. His administrative appeal would be deemed exhausted as to these responses, as well.

Because Ervin is deemed to have exhausted administrative remedies with respect to at least some of his requests, his FOIA claim will not be dismissed. Later factual development will allow a determination as to exhaustion of administrative remedies as to each request for information.

## V. Failure to State a Claim for Relief under the APA

Count VII of Ervin's complaint alleges that HUD's actions, particularly with respect to the Financial Advisory Services contracts

---

7. Ervin concedes that he may only bring this cause of action against HUD, and that it should be dismissed as to all individual defendants.

and Cross–Cutting Task Order awarded to Hamilton, the first and second Due Diligence contracts, the SWAT procurement, HUD's nonperformance on Ervin's Audited Financial Services .contract, and HUD's withholding of money for services already performed on Ervin's contracts, were arbitrary, capricious, in abuse of discretion, and not in accordance with the law. Under the APA, agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" are unlawful. 5 U.S.C. § 706(2)(A). Thus, Ervin asks that the Court review the contracting decisions that are allegedly in violation of the APA, and, if the agency is unable to provide a satisfactory explanation, declare them unlawful.

The government argues that this claim must be dismissed because Ervin is attempting to find in the APA a nonexistent, independent ground for relief that would require the agency to provide Ervin with an explanation for its actions. The government argues that the only basis for such a request is the requirement under 48 C.F.R. § 15.1004 that the government provide unsuccessful bidders with an opportunity for a debriefing, provided that the unsuccessful offeror makes the requisite request in the appropriate manner and within the required time limits.

██ Although Ervin alleges that the government may not have complied with its obligation under 48 C.F.R. § 15.1004 to provide him with a satisfactory debriefing with regard to the contracts listed above, his entire Complaint alleges numerous other statutory and constitutional violations. This Count of his Complaint asks that the agency provide the Court with an explanation for its allegedly unconstitutional decisions, and that the Court evaluate the decisions under the APA standard to determine in they are lawful. The Court's review of HUD's action to determine if it is arbitrary, capricious, or in violation of the law is not dependent on Ervin's entitlement to a debriefing under 48 C.F.R. § 15.1004.

██ The government also argues that Ervin lacks standing under the APA to challenge agency action in which he had no stake, i.e., the subsequent administration of contracts that were not awarded to Ervin. The government refers here to Ervin's request that the Court find HUD's award of the Cross–Cutting Task Order under the second Financial Advisory Services contract unlawful. Ervin alleges that the "task order" was actually a separate contract that should have been open to competition among other qualified contractors, including himself. Complaint at 14–15. Ervin has constitutional standing to challenge the procurement of the task order; his injury is the inability to bid on a "contract" for which HUD improperly failed to allow competitive bidding, an injury that is directly traceable to HUD's decision to allow competition only among the four firms already awarded Financial Advisory Services contracts, and redressable if the Court grants Ervin the relief he requests. *See CC Distributors, Inc. v. U.S.,* 883 F.2d 146, 149–51 (D.C.Cir.1989), *contrasting Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838 (D.C.Cir.1982). Ervin also has "prudential" standing to challenge the procurement of the task order under the APA, as a contractor's interest in competitive bidding falls within the "zone of interests" to be furthered by statutes and regulations that allegedly obligate HUD to award the task order on the basis of competitive bidding.

## VI. Lack of Standing

██ The government argues that Ervin lacks standing, with respect to the following contracts, to bring his claims for relief in the form of a declaration that contracts are void *ab initio:* (1) under Counts I and II, with respect to the Single Family Asset Management contract, (2) under Counts I, II, and VIII, with respect to the second Due Diligence contract, and (3) under Count VIII with respect to the first Due Diligence contract. The government argues that Ervin lacks standing because he was not in the "zone of active consideration" to be awarded the Single Family Asset Management, or the first and second Due Diligence contracts, so the relief requested would be of no benefit to him.

██ Ervin's challenge to the Single Family Asset Management contract does not fail for lack of standing. Ervin and GAMEX,

together, submitted a bid for this contract, and the team was deemed "technically unqualified." The determination that the Ervin/GAMEX team was technically unqualified is a factual determination, ultimately within the discretion of the agency. However, the agency does not have discretion to make its decision based on an arbitrary or capricious abuse of discretion. Ervin's allegation that HUD's "technically unqualified" determination was a retaliatory act places him squarely within the framework of a "disappointed bidder," whose right to sue was first recognized in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Ervin's contention is that he was technically qualified to perform the contract and that he would have been within the zone of active consideration, had HUD not arbitrarily and wrongly rejected his bid as technically unqualified. His challenge to the Single Family Asset Management award claim will not be dismissed for lack of standing. If he prevails on his claim, a declaration that the contract award is void would allow him to bid on, and possibly win, the contract.

 Similarly, with respect to the first Due Diligence contract, the government's standing argument fails because if Ervin prevails on his claim, he could be in a position to bid on and win the contract award. Ervin was precluded from bidding on this contract because it was purportedly procured under the Small Business Administration's 8(a) program, which benefits small, economically and socially disadvantaged businesses. *See* 15 U.S.C. 637(a). Ervin's claim with respect to the first Due Diligence contract is that HUD is actually applying its own preference, independent of the 8(a) requirements, that is entirely race-based. He alleges that Williams, the contractor who won the First Due Diligence contract, was not qualified as an 8(a) contractor. Complaint at 19, 63. If the government purported to use the 8(a) program, but was instead applying its own race-based criteria that did not depend upon qualification for the 8(a) program, it is possible that Ervin was precluded from winning the contract only because of his race. He could potentially be within the zone of active consideration and has standing to challenge the contract award on equal protection grounds.

However, the government correctly argues that Ervin lacks standing to request reprocurement of the second Due Diligence contract. Unlike his challenge to the award of the first Due Diligence contract, Ervin does not contest the qualifications under the 8(a) program of the recipients of the second Due Diligence contracts. He contests their technical ability to perform the contracts. Even if Ervin could show that the recipients of the contract awards were not technically qualified to perform, he could not obtain the contract award himself. The 8(a) program sets out criteria for participation that Ervin cannot and did not attempt to meet. Thus, even if the Court were to void the contract award and order reprocurement, Ervin would be ineligible to compete for the contract. Ervin is not within the zone of active consideration for the award. *See Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir.1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974). Ervin's claim for relief in the form of a declaration that the second Due Diligence contract awards be declared void will be dismissed for lack of standing. Ervin will not be precluded from pursuing other relief, under the First and Fifth Amendments, with respect to this award.

## CONCLUSION

The Court will grant the government's Motion to Dismiss Ervin's Fifth Amendment due process claims with respect to the second Financial Advisory Services and Single Family Asset Management contracts; and Ervin's request for relief in the form of a declaration that the second Due Diligence contract is void *ab initio,* for lack of standing. In all other respects, the government's Motion to Dismiss will be denied.